**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Crim. No. 4:20-cr-232-ALM-KPJ** |
| | § | |
| **CHAD MICHAEL RIDER (#2),** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is Defendant Chad Michael Rider's ("Defendant") Motion to Suppress Statements (the "Motion") (Dkt. 101), wherein Defendant seeks to suppress statements he made to law enforcement. The Government filed a response in opposition to the Motion (Dkt. 103), to which Defendant filed a reply (Dkt. 108). The Motion was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636. *See* Dkt. 109. On June 16, 2022, the parties appeared for a hearing on the Motion (the "Hearing"), during which Detective Joe Adcock ("Detective Adcock") of the Flower Mound Police Department testified on the Government's behalf. *See* Dkt. 117. After the Hearing, the parties filed supplemental briefing. *See* Dkts. 119, 122. Upon consideration, the Court recommends the Motion (Dkt. 101) be **DENIED**.

**I.    BACKGROUND**

In the Spring of 2020, the United States Department of Homeland Security ("HSI") began investigating the alleged transport of child pornography by individuals in Grayson County, Texas. *See* Dkt. 101 at 1–2; Dkt. 103 at 1. Through the course of its investigation, HSI identified two

1

target individuals: Defendant and co-defendant David Pettigrew[1] ("Mr. Pettigrew"). *See* Dkt. 101 at 2; Dkt. 103 at 1–2. On August 19, 2020, Defendant was indicted with violations of 18 U.S.C. §§ 2252A(a)(1) and (b)(1) (Transportation of Child Pornography) and 18 U.S.C. §§ 2251(a) and (e) (Sexual Exploitation of Children a/k/a Production of Child Pornography, Conspiracy). *See* Dkt. 7. Defendant was arrested shortly thereafter on August 21, 2020. On January 13, 2022, a First Superseding Indictment was filed, which charges Defendant with violating 18 U.S.C. §§ 2251(a) and (e) (Sexual Exploitation of Children a/k/a Production of Child Pornography; Conspiracy), 18 U.S.C. §§ 2251(a) and (e) (Sexual Exploitation of Children a/k/a Production of Child Pornography; Attempt), and 18 U.S.C. §§ 2251(a) and (e) (Sexual Exploitation of Children a/k/a Production of Child Pornography). *See* Dkt. 96. Defendant—who is scheduled to be tried before a jury beginning July 18, 2022, *see* Dkt. 106—now seeks to suppress statements made to law enforcement during an interview with Detective Adcock and HSI Special Agent Bruce Donnet ("Agent Donnet" and together with Detective Adcock, the "Interviewers"). *See* Dkt. 101.

Defendant's residence was searched on August 21, 2020, pursuant to a search warrant. *See* Dkt. 101 at 3; Dkt. 103 at 2; Dkt. 120, Hearing Transcript ("Hr'g Tr.") at 6:1–7. Detective Adcock testified approximately twenty law enforcement personnel were present, including: approximately eight officers tasked with entering and searching Defendant's residence; officers from the Anna Police Department, who appeared in a marked police vehicle; a polygrapher; a forensic team; and a team of officers to secure the perimeter of the residence. Hr'g Tr. at 116:5–18. Some of the personnel donned tactical gear, including helmets, vests, and breaching tools. Hr'g Tr. at 43:13–25. At least one officer possessed a rifle. Hr'g Tr. at 57:7–8. Agent Donnet was present and had

---

[1] Mr. Pettigrew was sentenced to 360 months' imprisonment followed by 15 years of supervised release pursuant to a plea agreement entered in this case. *See* Dkt. 86.

on his person a warrant for Defendant's arrest. *See* Dkt. 101 at 3; Dkt. 103 at 3; Dkt. 103-1, Interview Transcript ("I. Tr.") at 110:22–25.

The search began at approximately 6:00 a.m., at which point officers donning tactical gear approached Defendant's residence with guns drawn. Hr'g Tr. at 6:10–19, 56:3–16. Before the officers reached the front door, Defendant's wife and children opened the front door to exit the residence, presumably to leave for school. Hr'g Tr. at 6:17–23. Defendant's wife and children were instructed by law enforcement to remain outside while officers searched the residence. Hr'g Tr. at 10:21–22, 61:23–25. Detective Adcock, who partook in the search of Defendant's residence, testified the officers then entered the residence and cleared the first floor. Hr'g Tr. at 7:16–23. The officers ascended the stairs to the second floor of Defendant's residence, announcing their presence and their possession of a search warrant as they went. Hr'g Tr. at 7:20–8:1. Detective Adcock testified they also called out for Defendant, as the officers had not yet made contact with Defendant. Hr'g Tr. at 8:5–12. Detective Adcock testified it was unusual that they had not yet encountered Defendant by that time, which Detective Adcock stated gave rise to concerns regarding security and destruction of evidence. Hr'g Tr. at 8:18–9:7.

The officers subsequently encountered Defendant on the second floor of the residence as Defendant exited his bedroom. Hr'g Tr. at 9:14–16. Detective Adcock testified the officers' guns were drawn and pointed toward Defendant until he emerged from the bedroom unarmed with his hands raised. Hr'g Tr. at 61:7–10, 111:13–21, 112:21–22. Detective Adcock testified Defendant was then "passed down" the stairs and escorted out of the residence while the officers cleared the second floor. Hr'g Tr. at 9:18–10:5.

After the second floor of the residence was cleared of Defendant and the other children, Detective Adcock exited the residence and observed Defendant with Agent Donnet. Hr'g Tr. at

10:4–10. Detective Adcock testified Defendant was clothed, Hr'g Tr. at 15:19–20, but was without shoes, Hr'g Tr. at 74:15–20, and Defendant was not handcuffed, Hr'g Tr. at 10:13–14. Detective Adcock further testified that no weapons were drawn, Hr'g Tr. at 10:15–16. Defendant's wife and children were also outside the residence. Hr'g Tr. at 10:21–22.

Detective Adcock and Agent Donnet invited Defendant to speak with them in Agent Donnet's unmarked police vehicle, which was parked on the street, approximately ten to fifteen seconds, walking, from where Defendant was standing. Hr'g Tr. at 95:1–6; 14:3–6; 15:10–12. Defendant agreed, and the parties proceeded to Agent Donnet's vehicle. Hr'g Tr. at 11:1–6. By this time, the sun was up. Hr'g Tr. at 15:16–18. Detective Adcock testified neither he nor Agent Donnet touched Defendant and neither of them had their weapons drawn. Hr'g Tr. at 16:11–17. Detective Adcock testified he and Agent Donnet were both in plain clothes along with a body armor vest, although Detective Adcock testified Agent Donnet removed his vest upon entering the vehicle. Hr'g Tr. at 15:21–16:10. Detective Adcock testified Defendant was "patted down" prior to entering the vehicle to ensure he had no weapons on his person. Hr'g Tr. at 74:23–75:3. Agent Donnet's vehicle was parked facing Defendant's residence, Hr'g Tr. at 16:20–21, and within view of the residence, Hr'g Tr. at 15:13–15. Agent Donnet sat in the driver's seat, Defendant sat in the front passenger's seat, and Detective Adcock sat in the seat behind Agent Donnet. Hr'g Tr. at 16:18–19, 17:5–8. None of the three individuals were seat belted. Hr'g Tr. at 17:3–4. The doors to Agent Donnet's vehicle were not locked, Hr'g Tr. at 17:25–18:1, and Defendant was neither told he was free to leave, Hr'g Tr. at 114:20–23, nor was he told he was not free to leave the vehicle.

While seated in Agent Donnet's vehicle, Detective Adcock and Agent Donnet interviewed Defendant for approximately one hour and twenty-three minutes. *See* Dkt. 103 at 5; Dkt. 108 at

11. At the start of the interview, Agent Donnet provided Defendant with a written copy of his *Miranda* warnings and thereafter read Defendant his *Miranda* warnings:

> Agent Donnet:     Okay. Before we ask you any questions, it's my duty to advise you of your rights. Uh, we have the– you have the right to remain silent. Anything you say can be used against you in the court of law or other proceedings. You have the right to consult an attorney before making any statements or answering any questions. You have the right to have an attorney present with you during questioning. If you cannot afford an attorney, one will be appointed, uh, for you before any questions if you wish. If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

*See* I. Tr. at 2:4–22. The written *Miranda* warnings contained a space where Defendant could sign indicating that he understood his *Miranda* warnings and chose to waive them. *See* I. Tr. at 1:22–2:23; Hr'g Tr. at 23:17–24:2. After Agent Donnet finished reading Defendant his *Miranda* warnings, Agent Donnet invited Defendant to execute the written waiver, but Defendant declined:

> Agent Donnet:     I mean you're more than welcome to sign this or not. Um–
>
> Defendant:     I'm not gonna sign anything. I don't know what's going on.
>
> Agent Donnet:     You don't– that's perfectly fine. That's why I just said you can sign it if you're comfortable. Uh, I don't necessarily need you to. . . .

*See* I. Tr. at 2:22–3:4. Thereafter, Agent Donnet explained to Defendant the reasons underlying the search:

> Agent Donnet:     . . . We had some information on [Mr. Pettigrew], obviously, cause we arrested him, right? Well, um, he is in federal custody . . . . Um, and he did tell us about your involvement too, so.
>
> Defendant:     My involvement?
>
> Agent Donnet:     Your involvement, yeah.

5

| | |
|---|---|
| Defendant: | What was my involvement with him? |
| Agent Donnet: | I was hoping you'd tell us. |
| Defendant: | No. |
| Agent Donnet: | Okay. Well, you are involved . . . . |
| Det. Adcock: | Yeah, so– so I'm the one that interviewed initially, uh, Mr. Pettigrew. . . . So, during the course of that investigation, um, you know, he started kind of unburdening himself . . . . And as a result of forensics of [items seized by law enforcement] and – and of course [Mr. Pettigrew's] interviews, um, is what's leading us to you. |

*See* I. Tr. at 3:15–5:25. Agent Donnet and Detective Adcock informed Defendant that Mr. Pettigrew admitted to setting up cameras in a local church and recording minors in various stages of undress and that law enforcement seized videos showing that Defendant helped Mr. Pettigrew set up the cameras. *See generally* I. Tr. at 5–6. Thereafter, Agent Donnet and Detective Adcock questioned Defendant regarding his involvement. *See generally* I. Tr. at 6–112. They informed Defendant they knew he was involved—that they had evidence of his involvement—and were there to determine the extent to which Defendant was involved. *See, e.g.*, I. Tr. at 4:5–9, 25:19–23.

Detective Adcock testified the tone of the interview was "conversational" and somewhat of a "chess match," Hr'g Tr. 27:8–9, as Defendant asked the Interviewers "probative questions," as well. Hr'g Tr. at 22:4–9, 27:9–18. For example, Defendant asked the Interviewers where the hidden cameras were located, *see* I. Tr. at 25:18, and what criminal penalties he was facing, *see* I. Tr. at 87:10–12. On two occasions during the interview, Defendant expressed his wish to consult with or have an attorney present for polygraph testing, *see* I. Tr. at 59:24–60:17, 94:25–95:25, and on another, Defendant asked whether he could consult an attorney, *see* I. Tr. at 87:10–18. But Defendant continued to speak with the Interviewers, at one point stating, "I'll talk to you now,

yes" in response to Agent Donnet's question, "You want to keep talking to us though?" *See* I. Tr. at 95:24–25.

Defendant now seeks to suppress all statements made during his interview with Agent Donnet and Detective Adcock. *See* Dkt. 101. The Government opposes Defendant's Motion. *See* Dkt. 103. The Government provided a transcript of the interview. *See* Dkt. 103-1. The Court will quote additional portions of the transcript herein, as pertinent to the Court's analysis.

## II.    LEGAL STANDARD

The Fifth Amendment provides, in part, "No person shall . . . be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "This clause permits a person to refuse to testify against himself at a criminal trial in which he is a defendant and also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Vega v. Tekoh*, No. 21-499, -- S. Ct. --, 2022 WL 2251304, at *4 (June 23, 2022) (cleaned up) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984)). To prevent violations of this right, the law requires an individual be provided *Miranda* warnings before being subjected to a "custodial interrogation." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (quoting *United States v Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988)); *see Vega*, -- S. Ct. --, 2022 WL 2251304, at *8 ("The *Miranda* rules are prophylactic rules that the Court found to be necessary to protect the Fifth Amendment right against compelled self-incrimination."). *Miranda* warnings advise the individual that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to have an attorney present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). If, during the questioning, the individual indicates he wishes to invoke his right to remain silent or his right to have an attorney present, there can be no further

questioning until an attorney is provided (if requested) or until the individual reinitiates conversation. *See id.*; *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). A *Miranda* violation occurs when the government fails to abide by *Miranda's* strictures. The proper remedy for a *Miranda* violation is to exclude any resulting statement from trial. *United States v. Chasteen*, No. 4:20-cr-164, 2021 WL 1391448, at *3 (E.D. Tex. Apr. 13, 2021) (citing *United States v. Patane*, 542 U.S. 630, 642 (2004)); *accord United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (quoting *United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021)) (generally, statements made during a custodial interrogation are inadmissible if *Miranda* warnings were not previously administered).

## III.    ANALYSIS

Defendant moves to suppress all statements made during his interview with Detective Adcock and Agent Donnet. Defendant argues the statements were obtained in violation of his Fifth Amendment right against self-incrimination, as he was subjected to custodial interrogation, he did not waive his *Miranda* rights, and because his invocations of his right to counsel were not honored by Agent Donnet and Detective Adcock. *See* Dkt. 101. Defendant further argues the statements were obtained in violation of his right to due process. *See id.* The Government opposes the Motion. According to the Government, Defendant was not "in custody" during the interview and, therefore, *Miranda* warnings were not required. *See* Dkt. 103. The Government alternatively argues that, even if Defendant was in custody, Defendant waived his *Miranda* rights and did not later invoke his right to counsel. *See id.* According to the Government, there is no basis to suppress Defendant's statements. *See id.* As set forth herein, the Court finds Defendant's interview was not a custodial interrogation under *Miranda* and, even if it was, Defendant implicitly waived his *Miranda* rights by voluntarily speaking with the Interviewers. The Court further finds that Defendant did not

subsequently invoke his right to have counsel present during the Interview, and Defendant's statements were not obtained in violation of Defendant's right to due process. Accordingly, the Court recommends the Motion be denied.

### A. Custodial Interrogation

An interrogation is custodial if the person is placed under formal arrest or if "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Gonzalez*, 814 F. App'x 838, 842 (5th Cir. 2020) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012) (alteration in original)). In other words, absent a formal arrest, the court "must determine whether 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Id.* (quoting *Bengivenga*, 845 F.2d at 596). This is an objective inquiry that depends on the totality of the circumstances of the investigation. *Michalik*, 5 F.4th at 588. Five factors are relevant: (1) the length of questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) any statement made by officers regarding the individual's freedom to move or leave. *Id.* (quoting *Nelson*, 990 F.3d at 955); *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015). If the Court concludes the individual's "freedom of movement was so curtailed," it then asks whether the interrogative environment "presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Gonzalez*, 814 F. App'x at 842 (cleaned up) (quoting *Howes*, 565 U.S. at 509). If so, the interrogation was custodial.

It is the defendant's burden to prove that he was in custody. *United States v. Rahim*, 382 F. Supp. 3d 561, 567 (N.D. Tex. 2019) (citing *United States v. Webb*, 755 F.2d 382, 390 (5th Cir. 1985)). In this case, the Court finds Defendant has not met his burden, as the evidence presented

during the Hearing indicates a reasonable person in Defendant's position would not have "understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Id.* at 842.

    1.  <u>Five Factors</u>

The first factor—length of questioning—favors a finding of custody. There is no "constitutional time limit" for authorities to question an individual before triggering *Miranda. Rahim*, 382 F. Supp. 3d at 570; *United States v. Jin*, No. 4:21-cr-48, 2021 WL 6137594, at *4 (E.D. Tex. Dec. 2, 2021) (quoting *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990)), *R & R adopted*, 2021 WL 6135774 (E.D. Tex. Dec. 29, 2021). While the Fifth Circuit has declined to hold that an interview of one hour constitutes *per se* custodial interrogation, it has held that an interview length of one hour or more favors a finding that the interview was custodial. *Michalik*, 5 F.4th at 588 (holding this factor favored custody where the defendant was interviewed for about an hour); *Wright*, 777 F.3d at 771, 777 (same); *see also Rahim*, 382 F. Supp. 3d at 570 (finding a detention of one hour and twenty minutes favored custody, even where the substantive questioning lasted only forty-eight minutes). In this case, the parties agree Defendant was interviewed for more than one hour. Therefore, this factor weighs in favor of custody.

The second factor—location of the questioning—weighs against a finding of custody. Courts in this district have routinely recognized that questioning in a police vehicle does not render an interrogation custodial. *Jin*, 2021 WL 6137594, at *4. And further, the Fifth Circuit has held that an interrogation in a police vehicle weighs against a finding of custody if the police vehicle is parked near the defendant's residence and is subject to public scrutiny. *See Gonzalez*, 814 F. App'x at 843 (holding the second factor disfavored custody where the defendant was interviewed in the back seat of the agent's vehicle, which was parked within forty feet of the defendant's residence

and was subject to "public scrutiny"); *Michalik*, 5 F.4th at 588 (same, where the defendant "sat in the passenger-side front seat of a police car on the street near his house. . . . subject to public scrutiny"); *Wright*, 777 F.3d at 771, 777 (same, where the defendant was interviewed in the front seat of a police vehicle that was parked approximately thirty feet from his home and subject to public scrutiny). In this case, the interview took place in Agent Donnet's vehicle, which was parked on the street, approximately a ten to fifteen second walk from Defendant's front yard. The vehicle was visible from Defendant's residence, and traffic passing on nearby West Crossing Boulevard could be seen from the vehicle. Hr'g Tr. at 19:1–8; *see also* Gov't Ex. 3 (aerial view of Defendant's neighborhood depicting location of Defendant's residence on the corner of Rochdale Drive and West Crossing Boulevard); Gov't Ex. 4 (street view from approximate location of Agent Donnet's vehicle looking toward Defendant's residence and West Crossing Boulevard). During the interview, Defendant sat in the front passenger seat, "not the back seat where arrestees usually sit." *See Gonzalez*, 814 F. App'x at 843. Given the interview took place near Defendant's home and in a place subject to public scrutiny, the Court finds "a reasonable person in [Defendant's] position would not have understood the situation to constitute a restraint on freedom of movement equivalent to formal arrest." *See id.*; *Michalik*, 5 F.4th at 588; *Wright*, 777 F.3d at 771, 777.

The third factor—the accusatory, or non-accusatory, nature of the interview—is neutral. When considering this factor, courts in the Fifth Circuit consider both the tone of the interview (e.g., whether the conversation was cordial or cooperative) and the nature of the questioning (e.g., whether the questions were accusatory). *See, e.g., Nelson*, 990 F.3d at 955 (holding the defendant was not in custody and noting the agent's "tone was cooperative and he never accused [the defendant] of lying or committing a crime"); *Michalik*, 5 F.4th at 588 (considering the tone of the conversation and the defendant's level of cooperation); *United States v. Chavira*, 614 F.3d 127,

134 (5th Cir. 2010) (considering the increasingly accusatory nature of the questioning). In this case, on the one hand, Detective Adcock testified the conversation between Defendant and the Interviewers was conversational and that Defendant also asked the Interviewers questions during the interview. Indeed, Detective Adcock testified that he perceived the interview to be a "chess match" between the Interviewers and Defendant, whereby the Interviewers sought to obtain information regarding Defendant's involvement in the alleged crimes and Defendant sought to determine the extent to which the evidence connected Defendant to the alleged crimes. Hr'g Tr. at 27:8–18. Detective Adcock further testified that Defendant was generally cooperative and that Defendant never became hostile toward the Interviewers and did not, at any point, exhibit fear or physical discomfort. This evidence indicates a reasonable person might have felt free to terminate the interview and leave. *See Michalik*, 5 F.4th at 588 (holding this factor weighed against custody where the conversation was "cordial" and the defendant was "cooperative" with the officers); *Gonzalez*, 814 F. App'x at 838 (holding this factor weighed against custody where the agents' tone remained "measured" and "very professional" and where the conversation was as much of an opportunity for the defendant to tell his story to the officers as it was for the officers to elicit information).

However, the interview transcript reflects that some of the Interviewers' questions were accusatory in nature. For example, the Interviewers told Defendant they knew he was involved in the pornography scheme, *see e.g.*, I. Tr. at 25:20–26:1,[2] and that they were trying to get a sense of what "level monster" Defendant was, *see* I. Tr. at 59:9–20, and whether it was safe to permit Defendant to be near his own children, *see* I. Tr. at 86:16, 98:5–99:12. The Interviewers further

---

[2] Detective Adcock: "So, we're not here to decide what your involvement is, or if you were involved. We know you were involved, that's why we're here. What we're here for is to get your side of the story to try to figure out whose idea it was, who the mastermind is . . . ."

encouraged Defendant to "be honest," to "unburden himself," and to "Get all that darkness out of your body." *See* I. Tr. at 87:1–9. A reasonable person might have felt unable to leave based on the accusatory nature of these questions. *See Chavira*, 614 F.3d at 134 (noting the officers told the defendant "they knew she was not telling the truth and to confess" and propounded "increasingly accusatory questions" and holding the circumstances suggested a reasonable person might have felt unable to leave); *Bengivenga*, 845 F.2d at 597 n.16 ("The awareness of a person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave . . . ." (emphasis removed) (citation omitted)); *United States v. Romero-Medrano*, 207 F. Supp. 3d 708, 713 (S.D. Tex. 2016) (finding this factor favored custody where the officers told the defendant they knew a crime was committed and advised the defendant to tell the truth about his involvement).

The fourth factor—the amount of restraint on Defendant's physical movement—weighs against a finding of custody. Courts have found this factor weighs in favor of custody where the defendant is physically restrained (e.g., handcuffed) or not permitted to wander during the interview. *See, e.g., Cavazos*, 668 F.3d at 194 (holding the defendant was in custody when, *inter alia*, the defendant was handcuffed, escorted and monitored while using the restroom, and was permitted to make phone calls only on speaker phone so the agents could overhear the conversation); *Romero-Medrano*, 207 F. Supp. 3d at 714 (finding this factor weighed in favor of custody where the defendant was told "to stand in one place" and would not have been permitted to retrieve shoes from his apartment without a police escort). In this case, Detective Adcock testified that, prior to the search, Defendant was unrestrained in the front yard or driveway of the residence. Detective Adcock testified Defendant voluntarily joined the Interviewers in Agent

Donnet's vehicle, that neither officer drew his weapon while walking toward the vehicle, and that neither officer physically placed Defendant in the vehicle. Further, Detective Adcock testified Defendant was completely unrestrained in the vehicle: he was not seat belted or handcuffed and the doors to the vehicle were unlocked. Indeed, Detective Adcock testified that, during a break in questioning, Defendant freely opened the vehicle door to provide instruction to other officers who were searching Defendant's vehicle. Because Defendant's movements were not restricted, the Court finds the evidence indicates a reasonable person in Defendant's position would have felt free to leave the vehicle and terminate the interview. *Compare, e.g.*, *Michalik*, 5 F.4th at 589 (holding this factor weighed against custody where the defendant was escorted to speak with agents in a police vehicle but was not handcuffed or otherwise physically restrained while in the vehicle) *and Gonzalez*, 814 F. App'x at 843 (holding this factor weighed against custody when the defendant spoke with agents in a police vehicle that was unlocked with partially open windows and where the defendant was not handcuffed or otherwise restrained during the interrogation, even though he was briefly handcuffed prior to the interrogation) *with Cavazos*, 668 F.3d at 192, 194 (holding the defendant was in custody where he was handcuffed and unable to use the restroom and make phone calls without police supervision) *and Romero-Medrano*, 207 F. Supp. 3d at 714 (finding this factor favored custody where the defendant was instructed by law enforcement not to move).

The fifth factor—statements made by the Interviewers regarding Defendant's freedom to leave—is neutral. As with the length of questioning, there is no bright line rule that requires an individual to be told he is free to leave. *United States v. Alvarez*, 837 F. App'x 296, 300 (5th Cir. 2020) (citing *United States v. Ortiz*, 781 F.3d 221, 230 (5th Cir. 2015)). However, statements expressing or implying that a defendant is free to leave may militate against a finding that the

defendant was in custody. *See Rahim*, 382 F. Supp. 3d at 572 (quoting *Romero-Medrano*, 207 F. Supp. 3d at 714); *Gonzalez*, 814 F. App'x at 843 ("By asking—rather than forcing—[the defendant] to participate in the interview, the agents implied that he was free to terminate the questioning and leave the vehicle at any time."). It is uncontested that neither Agent Donnet nor Detective Adcock informed Defendant he was free to leave the vehicle. However, the record is similarly devoid of any statement made by either Interviewer that Defendant was not free to leave, that he was under arrest, or that he was obligated to continue answering questions. *See Jin*, 2021 WL 6137594, at *5. On this basis, the Court finds this factor weighs neither for nor against a finding of custody.

Considering the totality of the circumstances, the Court finds a reasonable person would have felt free to terminate the interrogation and leave Agent Donnet's vehicle. As such, the Court finds Defendant was not in custody during the interview.

2.  <u>Whether the Environment was Inherently Coercive</u>

Only if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest" does the Court consider the second prong of the custodial interrogation analysis, which queries whether the interrogative environment "presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Gonzalez*, 814 F. App'x at 842 (cleaned up) (quoting *Howes*, 565 U.S. at 509). In this case, because the Court finds a reasonable person would have felt free to terminate the interview and leave Agent Donnet's vehicle, the Court need not determine whether the interrogative environment, in this case, presented the same "inherently coercive pressures" as presented in *Miranda*. *See id.*

Nevertheless, the Court has considered the issue and finds the interview did not present inherently coercive pressures sufficient to trigger *Miranda*. The testimony reflects that neither Agent Donnet nor Detective Adcock ordered Defendant into the vehicle and that neither brandished his weapon. Defendant sat unrestrained in the front seat of the vehicle, which was parked a ten to fifteen second walk from his residence and near a boulevard with morning traffic, and willingly agreed to speak with the Interviewers. On balance, these circumstances militate against a finding that the interview environment was inherently coercive. *See id.* (finding no inherent coercion where the defendant was interviewed in the front seat of a vehicle parked forty feet from his house, was not ordered to get into the vehicle by the officers, where the officers didn't draw their weapons, and where the agents maintained a "calm and respectful" tone). And while "[a] reasonable person could certainly be 'startl[ed] and intimidate[ed]' by eight to ten agents searching his or her home, . . . that's not enough to constitute station-house-level coercive pressure." *Id.* (alteration in original) (citing *Wright*, 777 F.3d at 777 (also recognizing that, while the presence of seventeen or nineteen law enforcement officers in and around the defendant's home was startling and intimidating, the totality of the circumstances indicated the interview was non-custodial)). As such, the Court finds Defendant was not in custody during the interview and was, therefore, not required to be provided with *Miranda* warnings.

### 3. Arrest Warrant

Defendant argues the fact that Agent Donnet "bore an *arrest warrant* . . . should be dispositive" as to custody. *See* Dkt. 101 at 11. Defendant is incorrect. As stated above, whether a Defendant is in custody is an objective determination based on the totality of the circumstances surrounding the investigation. *Michalik*, 5 F.4th at 588. Agent Donnet's possession of an

unexecuted arrest warrant and the Investigators' subjective intent to arrest Defendant, if any,[3] are irrelevant to the key issue of whether a reasonable person in Defendant's position would have felt free to terminate the encounter and leave the vehicle.

### B.  Waiver of *Miranda* Rights

Even assuming, *arguendo*, Defendant was in custody during the interview, the Court finds Defendant waived his *Miranda* rights. Statements made during a custodial interrogation are admissible if the defendant knowingly and voluntarily waived his *Miranda* rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The Government has the burden to prove waiver by a preponderance of the evidence. *Thompkins*, 560 U.S. at 384.

It is undisputed that Defendant was provided with *Miranda* warnings when he entered the vehicle. The Interviewers not only verbally issued *Miranda* warnings at the initiation of the interview, but also provided Defendant with written *Miranda* warnings to read. *See* I. Tr. at 1:22–2:23; Hr'g Tr. at 23:17–24. Defendant argues he did not voluntarily and knowingly waive his *Miranda* rights. Defendant first argues he did not waive his rights because he did not sign the

---

[3] Detective Adcock testified that, at the time of the interview, he was unaware Agent Donnet had a warrant for Defendant's arrest. Hr'g Tr. at 42:18–20.

written waiver form. *See* Dkt. 101 at 11. Defendant's refusal to sign the written waiver is of no consequence because, as the Government argues, waiver can be made implicitly. *Thompkins*, 560 U.S. at 382. There is no requirement that a defendant's waiver be made in writing. *See id.* at 387 (recognizing the Supreme Court rejected the requirement that the police obtain an express waiver of *Miranda* rights before proceeding with interrogation); *United States v. Oliver*, 630 F.3d 397, 409–10 (5th Cir. 2011) ("The mere refusal to sign a written waiver does not automatically render inadmissible all further statements made by the defendant. . . . Indeed, '[a] refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody.'" (quoting *United States v. McDaniel*, 463 F.2d 129, 135 (5th Cir. 1972); and citing *Thompkins*, 560 U.S. at 388)). The Government does not need to show that a waiver of *Miranda* rights was express. *Thompkins*, 560 U.S. at 384. An implicit waiver is sufficient to admit an individual's statement into evidence. *Id.* (citing *Butler*, 441 U.S. at 375–76). Implicit waiver is established if the prosecution shows *Miranda* warnings were given and understood by the accused and that the accused thereafter made an uncoerced statement. *Id.* This is because the law "presume[s] that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.*

Hence, in this case, because it is undisputed Agent Donnet provided *Miranda* warnings to Defendant, the Court considers whether, based on the totality of the circumstances, Defendant voluntarily and knowingly waived his *Miranda* rights. Citing Defendant's educational background and business savvy, the Government argues Defendant understood his rights and the consequences of waiving them. *See* Dkt 103. The Government further argues that, by choosing to speak with the Interviewers, Defendant voluntarily and knowingly waived his *Miranda* rights. Defendant argues

the prosecution has not met its burden to show that Defendant waived his rights. In the alternative, Defendant argues he invoked his right to counsel three times during the interview and that any statement made after his invocation should be suppressed. The Court agrees with the Government and finds Defendant voluntarily and knowingly waived his rights.

    1.  <u>Voluntary Waiver</u>

A *Miranda* waiver is voluntary if it is "the product of free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Alvarado-Palacio*, 951 F.3d 337, 341 (5th Cir. 2020) (quoting *Moran*, 475 U.S. at 421). Trickery or deceit on the part of the police "is prohibited to the extent it deprives the suspect of 'knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id.* (quoting *Soffar v. Cockrell*, 300 F.3d 588, 589 (5th Cir. 2002) (en banc)). "The voluntariness of a waiver of *Miranda* rights has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word." *United States v. Cardenas*, 410 F.3d 287, 297 (5th Cir. 2005) (cleaned up) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)). Voluntariness is determined on a case-by-case basis and is viewed under the totality of the circumstances of the investigation. *Alvarado-Palacio*, 951 F.3d at 341 (quoting *Cardenas*, 410 F.3d at 293).

In this case, Defendant argues the Interviewers employed law enforcement's "most coercive tactics" by:

> telling [Defendant] Mr. Pettigrew would put all the blame on him; lying to [Defendant] in regards to statements made his [sic] wife, Melissa Rider; repeatedly accusing [Defendant] of being a liar; repeatedly suggesting [Defendant] was a danger to children . . . and telling [Defendant] that their job was "to determine . . . what level monster" he was.

*See* Dkt. 122 at 9. Defendant also argues the Interviewers appealed to his religious beliefs. *See* Dkt. 101 at 14. However, these practices are "no more coercive or intimidating than can regularly

be expected from the very nature of custodial interrogation" and, therefore, do not, in the eyes of the law, overcome a defendant's free choice to decide whether to speak with law enforcement. *See Thompkins*, 560 U.S. at 387 (questions referring to the defendant's religious beliefs do not render a responsive statement to be involuntary because "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" (quoting *Connelly*, 479 U.S. at 170)); *United States v. Gonzales-Gomez*, 703 F. App'x 335, 339 (5th Cir. 2017) (affirmative misrepresentations by an officer do not render a *Miranda* waiver to be involuntary unless "the deceit . . . deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." (quoting *Soffar*, 300 F.3d at 596; and citing *United States v. Tapp*, 812 F.2d 177, 179 (5th Cir. 1987))); *Cardenas*, 410 F.3d at 295, 297 (accusing the defendant of lying does not "constitute such gross intimidation or coercion so as to overcome a defendant's free will and render his statements inadmissible").

To the contrary, Detective Adcock testified Defendant agreed to speak with the Interviewers, answered questions, and was generally cooperative. Detective Adcock testified Defendant was not fearful or nervous, *see* Hr'g Tr. at 25:6–13, 35:6–9, and that at no point did the tone or demeanor of the interview change, Hr'g Tr. at 34:14–16. The evidence does not indicate Defendant ever expressed an intention to remain silent or refrain from answering questions. Indeed, Defendant actively partook in the conversation, at times even asking the Interviewers his own questions.

Under these circumstances, the Court finds there is no indication Defendant's free will was overridden by the Interviewer's conduct. *See Cardenas*, 410 F.3d at 297. Defendant, therefore, voluntarily waived his rights. *See Thompkins*, 560 U.S. at 386 (holding waiver was voluntary

where the defendant did "not claim that police threatened or injured him during the interrogation or that he was in any way fearful"); *Cardenas*, 410 F.3d at 295, 297; *United States v. Webb*, 856 F. App'x 553, 555 (5th Cir. 2020) (holding the defendant's waiver was voluntary even though the defendant claimed to be "sleep-deprived or in some altered state of consciousness"); *see also Chasteen*, 2021 WL 1391448, at *6 (finding the defendant's un-*Mirandized* statements were voluntarily made where "the officers did not threaten [the defendant] to the point that he was forced to confess to his crime" and so "did not overcome [the defendant's] free will"). Because Defendant voluntarily waived his *Miranda* rights, the Court next considers whether Defendant's waiver was knowingly made.

2.  Knowing Waiver

A waiver is knowingly made if the defendant waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Thompkins*, 560 U.S. at 382. In this case, the Court finds Defendant understood both the nature of his rights and the consequences of his decision to abandon them. Agent Donnet read aloud Defendant's *Miranda* warnings before the interview began, and Detective Adcock testified that, at the same time, Defendant was provided a written copy of the warnings. *See* Hr'g Tr. at 23:17–24. Detective Adcock testified Defendant is highly educated and works as a chiropractor. Hr'g Tr. at 98:2–5. Detective Adcock testified Defendant was fully aware during the interview and there was no indication Defendant was impaired by drugs or alcohol or that he otherwise did not understand his rights. Hr'g Tr. at 24:7–25:2, 98:6–24. Indeed, the testimony indicates that, although law enforcement arrived early in the morning, the family was awake and leaving the residence, Defendant was dressed, and the sun had risen. The record is devoid of any evidence indicating Defendant did not understand or was incapable of understanding his rights.

21

To the contrary, Defendant's statements during the interview indicate Defendant understood his *Miranda* rights. Defendant stated early in the interview that "it does seem like when people talk to police and do things without attorneys, a lot of things– times– innocent people do have issues." *See* I. Tr, at 60:14–17. Even so, Defendant did not request to have an attorney present during the interview. Defendant mentioned on two occasions that he would take a polygraph examination so long as an attorney was present. *See* I. Tr. at 59:24–60:17, 94:25–95:25. Later, when the Interviewers paused to ask Defendant whether he wished to terminate the interview, Defendant expressly stated he would continue speaking with the Interviewers without an attorney present. *See* I. Tr. at 95:24–25 (Q: "Do you want to take a poly or no?" A: "I would like to consult an attorney about it." . . . Q: "You want to keep talking to us though?" A: "I'll talk to you now, yes.").

Based on the foregoing evidence, the Court finds Defendant understood his rights. *See Thompkins*, 560 U.S at 385–86 (holding the defendant's waiver was made knowingly where the defendant received a written copy of the *Miranda* warnings, could read and understand English, was given time to read the warnings, and where the officer also read the warnings aloud); *Webb*, 856 F. App'x at 555 (holding the defendant's waiver was knowingly made when, during the interview, the defendant was "oriented, aware, provided appropriate responses to questions, engaged in dialogue, and clearly expressed his desire to talk to his interviewers"); *Romero-Medrano*, 207 F. Supp. 3d at 715 (finding the defendant's waiver was not knowingly made where the defendant was not given an opportunity to clarify his rights before the interview began *and further* where the defendant's subsequent "statements and conduct did not confirm that he understood what his *Miranda* rights were or what the consequences of waiving those rights would

be"). Because Defendant understood his rights and because his waiver was voluntarily made, Defendant validly waived his *Miranda* rights.

    3.  <u>Invoking Right to Counsel</u>

        Defendant argues that, even if he initially waived his right to counsel, Defendant later invoked his right to counsel on three occasions, which required the Interviewers to terminate the interview. *See* Dkt. 101 at 15–17. The Government acknowledges that Defendant, on three occasions, mentioned having an attorney; however, the Government argues Defendant's statements, when viewed in context, do not satisfy the Supreme Court's standard for invoking counsel. *See* Dkt. 103 at 11–14.

        If, during an interview, the defendant invokes his right to counsel, the interviewers must terminate the interview until a lawyer has been made available or the defendant, himself, reinitiates conversation. *Davis*, 512 U.S. at 458 (citing *Edwards*, 451 U.S. at 484–85). To invoke his right to counsel, a defendant must "unambiguously request counsel" such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. Importantly, the defendant's request for counsel must be viewed in the context in which the statement was made, not in isolation. *United States v. Contreras-Zamora*, No. 21-10813, 2022 WL 1467449, at *1 (5th Cir. May 10, 2022) (per curiam) (quoting *United States v. Carrillo*, 660 F.3d 914, 922 (5th Cir. 2011)).

        In this case, context matters. Defendant's statements, when viewed in context, do not constitute unambiguous requests to have counsel present during the interview. Defendant's first request informed the Interviewers of his desire to have counsel present during a polygraph examination, if one were to be administered:

> Agent Donnet:    For us to feel comfortable to, you know, let you have access to
>                   your own kids is– is we've gotta– we've gotta be comfortable

|  |  |
|---|---|
|  | allowing that. And one of the things that Joe brought out was the polygraph. So, if we could set that up, would you take it? |
| Defendant: | With an attorney. |
| Agent Donnet: | What do you mean? |
| Defendant: | Shouldn't I have an attorney? I'm– one of the things that Dave and I had in common was watching documentaries, real life documentaries. . . . And it does seem like when people talk to police and do things without attorneys, a lot of things– times– innocent people do have issues. |

*See* I. Tr. 59:24–60:17.

Defendant's third request likewise references Defendant's desire to have counsel present for a polygraph examination. *See* I. Tr. 94:25–95:25. To be sure, Agent Donnet clarified whether Defendant wished to continue speaking with the Interviewers, to which Defendant responded in the affirmative:

|  |  |
|---|---|
| Defendant: | I did some stupid stuff with him, yeah, we've just talked about it, yes. |
| Det. Adcock: | Okay. But I also think there's some other stuff that has happened . . . |
| Defendant: | You mean like pictures of girls in shorts or something? |
| Det. Adcock: | No, we talked about, I think– I think there's been some other hidden camera stuff that– yeah– |
| Agent Donnet: | You changed the subject pretty quickly. |
| Defendant: | No, I said– I said I'd like to talk to an attorney. I don't know where we're goin' with all this, and I don't know that what I've already done has made me guilty of something, you know, criminal guilty. |
| Agent Donnet: | Do you want to take a poly or no? |
| Defendant: | I would like to consult an attorney about it. |
| Agent Donnet: | Okay. |

| | |
|---|---|
| Defendant: | Here's my concern. Can I– can I tell you my concern? |
| Agent Donnet: | You want to keep talking to us though? |
| Defendant: | I'll talk to you now, yes. |

*See id.*

Finally, Defendant's second request simply asked for clarification as to whether Defendant could consult an attorney:

| | |
|---|---|
| Defendant: | However, what– what laws am I– what punishment am I looking at? |
| Det. Adcock: | That I– I can't tell you, 'cause a lot of this has to do– so, in the federal system, taking personal responsibility for your actions affects what happens to you. It does. |
| Defendant: | Can I speak to an attorney? |
| Det. Adcock: | That's entirely up to you. If you wanna do that, that's fine. I mean, that– that doesn't stop our investigation. We keep doing– I mean, we already have stuff obviously. And like I said, some of the stuff we're asking you about is– we already know the answers to, we're just trying to check your honesty and– and how deeply involved is this, or is this stuff that was in the past and no– no longer part of– you know, who you are now. |
| Defendant: | Oh, this is definitely in the past. Definitely. |
| Det. Adcock: | Okay. Which is good, I mean, that– that's– that's good in your favor, but. |
| Defendant: | The stuff that– that– that happened then that I got away from him and all of that, and. . . |

*See* I. Tr. 87:10–88:12. Courts in the Fifth Circuit have held that requests seeking clarification, or the like, are not sufficient to invoke counsel. *Compare United States v. Hawkins*, 554 F. Supp. 2d 675, 678–79 (N.D. Tex. 2008) (finding no clear invocation based on the defendant's question— "Could I get my lawyer to come now or [inaudible]?"—because the defendant's intonation and

25

demeanor were "more consistent with an intent to ask a clarifying question than to unambiguously request the presence of an attorney") *with United States v. Orellana-Hernandez*, No. 1-20-cr-41, 2021 WL 2212733, at *4 (E.D. Tex. May 12, 2021) (finding the defendant invoked his right to counsel when he "made the request in a definitive statement that in no way suggests he was confused about the availability or procedural aspect of retaining counsel"), *R & R adopted*, 2021 WL 2209672 (E.D. Tex. June 1, 2021).

Further, the record indicates Defendant continued to speak with the Interviewers after making each statement and did not indicate a desire to stop the interview until an attorney was present. Under these circumstances, a reasonable officer would not have understood Defendant's statements to be an invocation of Defendant's right to counsel. *Compare Contreras-Zamora*, 2022 WL 1467449, at *1 (holding the defendant did not invoke his right to counsel when the defendant "immediately continued speaking to the investigators and attempted to dispute the evidence they already had told him had been found" and "never indicated that he would stop the interview until an attorney was present" because "a reasonable officer would have understood that [the defendant] wanted to continue to talk, or at least that he was still making up his mind whether he would continue to talk") *with United States v. Oehlschlager*, No. 3:20-cr-378, 2022 WL 1488443, at *4 (N.D. Tex. May 11, 2022) (finding a clear invocation where the defendant stated, "I think I need the advice of an attorney" and thereafter "largely sat in silence and did not generally engage with [the agent's] questions").

Accordingly, the Court finds these statements were insufficient to constitute an invocation of Defendant's right to counsel.

### C. Due Process Violations

Defendant alternatively moves to suppress his statements based on alleged violations of his right to due process. *See* Dkt. 101 at 12–15. The Government can violate due process strictures whether or not a defendant is in custody. *United States v. Adair*, No. 4:16-cr-527, 2018 WL 322228, at *2 (S.D. Tex. Jan. 8, 2018). Like a *Miranda* violation, a due process violation occurs if the defendant makes a confession that is "involuntary, i.e., the product of coercion, either physical or psychological." *Id.* (quoting *Connelly*, 479 U.S. at 169). In this case, Defendant argues his statements were involuntarily made based on coercion. *See* Dkts. 103, 122. Defendant cites *Adair*, arguing the Interviewers' conduct in this case is "indistinguishable" from the conduct found in *Adair* to be so unduly coercive as to violate due process. *See* Dkt. 122 at 14.

In *Adair*, the Southern District of Texas granted a motion to suppress on due process grounds. *See Adair*, 2018 WL 322228, at *2–3. In that case, federal officers executed a search warrant at the defendant's residence at 6:15 a.m. *Id.* at *1. Approximately ten officers were present, and seven had weapons drawn as they approached the home. *Id.* Upon answering the door, the defendant—who was wearing only boxer shorts—was escorted out of his home, handcuffed, and placed in a police SUV. *Id.* Approximately fifteen to twenty minutes later, an agent brought the defendant clothing, removed his handcuffs, and informed him he was not under arrest. *Id.* At some point, the defendant asked to use the restroom; an officer accompanied him and watched the defendant urinate. *Id.* Thereafter, the defendant was escorted to an unmarked police vehicle for a police interview; the defendant sat in the front seat of the vehicle. *Id.* He was provided *Miranda* warnings "out of an abundance of caution." *Id.* The defendant confessed to committing pornography offenses and provided the officers with enough information to warrant the application

of several sentencing guideline enhancements. *Id.* at *2. The defendant subsequently moved to suppress his statements under both *Miranda* and due process. *Id.* at *1.

The court granted the defendant's motion based on due process violations without considering the defendant's *Miranda* arguments. *Id.* at *2–3. But the Southern District's reasoning did not focus on the foregoing facts, some of which *are* similar to the facts of this case. Rather, the Southern District focused on statements made by the interrogating officers, which the court found created a coercive environment. *Id.* The court specifically noted:

- The defendant was told if he did not speak with the officers, they would assume the worst (i.e., that he would cause physical harm to a child), which implied that speaking with the officers "was the only way [the defendant] could help himself";

- The officers signaled the interview was the defendant's "one chance to help himself"; and

- The defendant was told that "at the end of the day, [the defendant] would go one way and law enforcement officers another" even though the officers "knew that serious punishment," indeed, conviction with several sentencing enhancements, "was the all-but-certain result."

*See id.*

The Court agrees there are facts in *Adair* that parallel the facts in this case. However, the Court finds the circumstances of Defendant's interview with Agent Donnet and Detective Adcock are not similar to the circumstances of the police interview in *Adair.* In this case, in contrast to *Adair*, the Interviewers did not make representations that would deprive Defendant of the ability to understand the nature of his constitutional rights and the consequences of continuing to speak with the Interviewers. *Cf. Gonzales-Gomez*, 703 F. App'x at 339 (affirmative misrepresentations

by an officer do not render a *Miranda* waiver to be involuntary unless "the deceit . . . deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."). Here—unlike in *Adair*—the Interviewers did not represent to Defendant that he would be better served if he spoke with the Interviewers than if he did not. And the Interviewers did not represent to Defendant that he would walk free at the end of the day. To the contrary, the Interviewers made clear to Defendant that they did, in fact, have evidence connecting Defendant to the alleged crimes and they were trying to determine the extent of Defendant's involvement. *See, e.g.*, I. Tr. 87:22–88:5. Because the Interviewers' statements were not so deceitful as to overwhelm Defendant's will and substantively affect Defendant's decision-making, the Court finds Defendant's right to due process was not violated.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Defendant's Motion (Dkt. 101) be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id.*; *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996)

(en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 1st day of July, 2022.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE