# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| v. | § | Case No.  4:20-CR-232 (2) |
| | § | Judge Mazzant |
| | § | |
| CHAD MICHAEL RIDER | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant's Motion for New Trial (Dkt. #173), Defendant's

Supplement to His Motion for New Trial (Dkt. #179), and Government's Motion to Strike

Defendant's "Supplement to His Motion for New Trial" (Dkt. #180).  Having considered the

motions and the relevant law, the Court finds that the Defendant's Motion for New Trial (Dkt.

#173) should be **DENIED** and that Government's Motion to Strike Defendant's "Supplement to

His Motion for New Trial" (Dkt. #180) should be **GRANTED.**

## BACKGROUND

This case arises out of a scheme to sexually exploit minor children in the local community

by placing hidden cameras in various locations to film the minor children while undressing.  The

leader of it all was David Alan Pettigrew ("Pettigrew"), the head pastor at Denison Church of the

Nazarene, who had a hard drive full of thousands of files that included sexually explicit photos

and videos of minor victims.  This specific case involves Pettigrew's co-conspirator, Defendant

Chad Michael Rider ("Rider"), and his alleged involvement in the scheme.

The Government charged Rider with three counts in the First Superseding Indictment under

18 U.S.C. § 2251, subsections (a) and (e), for conspiracy and attempt for the substantive offense

of the Sexual Exploitation of Children, which is also known as the Production of Child

Pornography (Dkt. #96).  Each count refers to the same conduct, the filming of minor children, but in a different location.  Count One refers to the cameras that were set up in the Denison Church of the Nazarene, filming minor children while they were undressing and bathing after various events that were held by the church (Dkt. #138 at p. 1).  Count Two refers to the cameras that were set up in the bathroom of one of Rider's neighbors, filming the neighbor's daughter while she was in the bathroom at various times (Dkt. #138 at p. 1).  Count Three refers to the cameras that were set up in Rider's home, filming a young girl who was living with the Rider family while she was undressing and showering (Dkt. #138 at p. 1).  On July 22, 2022, following a four-day trial, the jury found Rider guilty on all three counts (Dkt. #164).

## I.  David Pettigrew

From 2006 to 2020, Pettigrew worked as the head pastor at the Denison Church of the Nazarene in Denison, Texas.  Pettigrew also assisted with the church's "children's department," which was a youth group of children and teenagers that met about twice a week at the church without parental supervision.  The church had multiple rooms that were designated specifically for the children's department.  During certain events with the youth group, Pettigrew could film sexually explicit videos of the minor children in one of these rooms (the "children's room") because of situations that he orchestrated.

The Government introduced evidence at trial that the federal government first learned about Pettigrew's criminal scheme involving minors back in June of 2019 when it received notice from the Royal Canadian Mounted Police that a user uploaded images associated with child pornography to the application Kik.  Federal officers also received a tip in May of 2020 that child pornography was uploaded to Yahoo!'s servers.  The Department of Homeland Security ("DHS") used both reports and ultimately tracked the user's IP address back to Pettigrew.  On August 6,

2

2020, officers executed a valid search warrant for Pettigrew's home.  During the search, Pettigrew agreed to speak with the officers and admitted that the relevant Kik account and Yahoo! email address belonged to him.  Eventually, the officers also searched the church, where they obtained an external hard drive that contained sexually explicit videos and photos of minor children. Pettigrew was arrested that same day.  On April 7, 2021, Pettigrew pleaded guilty to one violation of 18 U.S.C. § 2251, subsections (a) and (e) for the Sexual Exploitation of Children; Conspiracy and Attempt (Dkt. #58).  On August 23, 2021, the Court sentenced Pettigrew to 360 months of imprisonment, to be followed by a 15-year term of supervised release (Dkt. #86 at pp. 2–3).

## II.     The Hard Drive

After the officers obtained the hard drive from the church, the officers reviewed the contents of the files.  The hard drive contained thousands of files of minor children in various locations at various times, including moments where the minor children were undressing or fully naked.  The record indicates that DHS investigators were able to pinpoint that all the video files were taken in four different locations—three residential homes and the church where Pettigrew worked.  DHS investigators identified two main adults that were both seen and heard on the video files: Pettigrew and Rider.  On August 21, 2020, the officers obtained and executed a search warrant for Rider's home.  During the search, Rider voluntarily spoke with the officers and denied any knowledge about filming minors.  Rather, Rider informed the officers that he assisted Pettigrew and set up audio only devices in the children's room of the church, but Rider did not believe that they were actually filming the children because of his conversations with Pettigrew.

In reviewing the videos that were taken at the church, the video files depicted the children's room after multiple events.  The record indicates that the church would host events such as car washes and "sibling fight nights," which consisted of various competitions such as the teenagers

pouring Sprite on one another and attempting to get cotton balls to stick on their sibling.  During these events, the children would understandably get messy, and the children would be instructed to go in the children's room at different times to clean up once the event concluded.  In the children's room, there was a plastic swimming pool, a bucket of water, washrags, and various toiletries that the children could use to wash up.  Once they were done "bathing," the children could change into a clean set of clothes in that same room.  However, what the children did not know was that there were numerous hidden cameras in the children's room that captured videos of the children changing and bathing.  The cameras were angled specifically to capture the children in certain positions where the child would be changing or fully naked.  Both Pettigrew and Rider are heard and seen at various times in these video files.

Further investigation by the DHS revealed the locations of the three residential homes: Pettigrew's home, Rider's home, and the home of one of Rider's neighbors.  Rider can be seen and heard at various times during the videos that were taken in Rider's home.  The videos that were taken in the neighbor's home depicts neither Rider nor Pettigrew in the videos, but the evidence introduced at trial indicated that out of the two, only Rider would have access to specific bathroom in question where the neighbor's daughter was filmed.

### III.   Chad Michael Rider

During the relevant time for this case, Rider was a member of the Denison Church of the Nazarene and was the President of the Nazarene Youth Institute, which meant that he worked directly with the children at the church.  Because of his position, Rider was present at all the above-mentioned events regarding "sibling fight nights" and the car washes, along with Pettigrew and the minor children.

Rider had two daughters and a wife living at home with him.  However, at some point, the Rider family also took in a young girl that was a friend of one of Rider's daughters.  The young

girl had a tough home life and had attended the church that Rider worked at with Rider's daughter. The young girl developed a relationship with the Rider family, and Rider and his wife received legal guardianship over the young girl.  At some point, the young girl was filmed by the hidden cameras because pictures of her in the bathroom were uploaded to the hard drive that was found in Pettigrew's office.

Rider and his family developed a friendship with Rider's neighbor and his family.  At some point, the neighbor's daughter was also filmed by hidden cameras in her bathroom, as those files also appeared on the hard drive.  The evidence introduced at trial is conflicting regarding who set these cameras up.  The Government presented testimony that Rider would go to his neighbor's home from time to time and had even been in the bathroom where the hidden cameras were placed. Additionally, Pettigrew had never been in the neighbor's home.  However, Rider countered this argument and presented evidence indicating that he believed it was the neighbor that set up the cameras in his own home, recording his own daughter after he became friends with Pettigrew.

## IV.    Procedural History

Ultimately, the jury was tasked with answering the question of whether Rider took part in Pettigrew's scheme, and if so, what actions were attributable to him.  The jury convicted Rider on all three counts, finding that he participated in the scheme and did so for each location.  On August 5, 2022, Rider timely filed the pending Motion for New Trial, alleging ten reasons why he is entitled to a new trial (Dkt. #173).  On August 25, 2022, the Government filed a response, opposing all ten allegations (Dkt. #177).   On October 28, 2022, Rider filed the pending Supplemental Motion, alleging two additional reasons he is entitled to a new trial (Dkt. #179).   Rider's Supplemental Motion was filed after the deadline to file a motion for new trial.  *See* FED. R. CRIM. P. 33(b).  On October 31, 2022, the Government filed the pending Motion to Strike, requesting

that the Court strike Rider's Supplemental Motion because it is untimely (Dkt. #180).   On

November 1, 2022, Rider filed a response to the Government's Motion to Strike (Dkt. #181).

## LEGAL STANDARD

Rule 33 provides that, on request, "the court may vacate any judgment and grant a new

trial if the interest of justice so requires." FED. R. CRIM. P. 33(a).  The decision to grant or deny a

motion for new trial pursuant to Rule 33 is well within the Court's discretion.  *E.g.*, *United States*

*v. Wall*, 389 F.3d 457, 465 (5th Cir. 2004) (citing *United States v. O'Keefe*, 128 F.3d 885, 893 (5th

Cir. 1997)).

"Generally, motions for new trial are disfavored and must be reviewed with great caution."

*United States v. Smith*, 804 F.3d 724, 734 (5th Cir. 2015).  The Court typically "should not grant

a motion for new trial unless there would be a miscarriage of justice . . . ." *Wall*, 389 F.3d 466

(citation omitted).  As such, a new trial is proper only where the defendant's "substantial rights"

have been harmed—either based on a single error or the cumulative effect of multiple errors.

*United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015).

## ANALYSIS

Rider raises ten reasons in his initial motion why he is entitled to a new trial under Rule

33.  These arguments include determinations that were made by the Court pre-trial that deprived

Rider of a fair trial, events that occurred throughout the trial that were wrongfully allowed for the

jury's consideration, and insufficient evidence to support a conviction.  However, as a preliminary

matter, the Court will first address whether it will consider Rider's Supplemental Motion (Dkt.

#179), which the Court finds included two new arguments that were not raised in the initial motion.

A motion for new trial must be filed with the Court within fourteen (14) days of the initial

verdict unless that motion is based on newly discovered evidence.  FED. R. CRIM. P. 33(b).  The

Court may grant an extension under Rule 45(b), but only if a party requests more time within the originally prescribed period, if the party can point towards "excusable neglect," or if the Court decides on its own to extend the time. *See United States v. Patton*, No. 2:11-CR-04, 2011 WL 4349511, at *3 (E.D. Tex. Sept. 16, 2011); *United States v. Dumas*, No. 17-215-01, 2020 WL 2573245, at *1 (W.D. La. May 21, 2020); *United States v. Kim*, No. H-07-406, 2009 WL 29688, at *1 (S.D. Tex. Jan. 5, 2009). Here, Rider does not raise any issues regarding newly discovered evidence. Rider also never requested that he needed more time for the original motion, and he did not request for leave to file the supplement. The supplement was filed ninety-eight (98) days after the verdict was issued, meaning eighty-four (84) days after the deadline. In his filings, Rider failed to provide a reason for the delay and did not point towards any excusable neglect for the late filing. The "relevant circumstances" are against granting Rider an extension and the Court will not decide on its own to grant an extension in this case, as Rider never requested one. *Kim*, 2009 WL 29688, at *1 (explaining that the Supreme Court's test in *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd.*, 507 U.S. 380, 395 (1993) that requires a court to look at the "relevant circumstances" to show excusable neglect applies in the criminal context).

Rider attempts to creatively argue that the supplement is simply a "supplemental argument in support of already existing, timely claims" and not a supplemental motion for a new trial (Dkt. #181 at p. 1). This argument is based on the idea that Rider preserved all issues regarding sufficiency of the evidence because he raised that issue both generally and to specific elements in his initial Motion for Judgment of Acquittal at the close of the Government's case. Rider cites to *United States v. McClaren* for support. 13 F.4th 386 (5th Cir. 2021). In *McClaren*, the Fifth Circuit held that one defendant had properly preserved the issue of ratification because a general Rule 29 motion for acquittal was raised at the close of the evidence. *Id.* at 408. The Fifth Circuit

was determining the proper standard of review based on whether the relevant argument was raised at trial, not whether the argument related back to a timely claim for a new trial.  Essentially, the problem with *McClaren* is that it does not speak to Rider's issue—whether Rider can raise new arguments why he is entitled to a new trial after the deadline.  Irrespective of the title that Rider gives the supplement, the two issues raised were not part of the ten issues in the initial new trial motion.  Regardless of whether these issues were properly preserved at the close of the case, they were not raised in the fourteen-day period that Rider had to file a motion for new trial.  The Court views this supplement as containing additional grounds for a new trial.  Consequently, the Court will have to decide if it will allow those arguments to relate back to the initial Motion for New Trial that was timely filed.

The plan language of Rule 33(b) does not allow the Court to accept the arguments that were raised in the Supplemental Motion.  The Court finds the dissent in *United States v. Bowen* as helpful in making its determination.  799 F.3d at 361 (Prado, J., dissenting).  The dissent points out that the Fifth Circuit has not spoken directly on the matter, but that "every court to have considered the issue—supports the conclusion that a later, untimely motion cannot relate back to, amend, or renew an original timely motion," then cites cases from the Second, Fourth, Sixth, Tenth, and Eleventh circuits that have agreed.  *Id.*  Judge Prado concludes with stating that a second motion that is filed outside of the statutory period is "left with recourse only to the stricter 'newly discovered evidence' standard."  *Id.*  The Court agrees.

The Court will not hear the issues raised in Rider's Supplemental Motion because they are untimely.  Instead, the Court will grant the Government's Motion to Strike, and the two issues raised in the supplement will not be included in the Court's analysis regarding whether Rider is entitled to a new trial.  The Court will now address the ten issues that Rider raised in turn.

## I.    Motion to Suppress

Rider's first argument reiterates the points made in his Motion to Suppress and states that the Court's denial of that motion "had an adverse effect on Mr. Rider's substantial rights" (Dkt. #173 at p. 2).  On August 21, 2020, law enforcement searched Rider's home, pursuant to a search warrant.  Rider and his family were escorted out of the home while the officers conducted the search.  The officers never put Rider in handcuffs, and he agreed to speak with the officers in an unmarked police vehicle right outside his home (Dkt. #124 at p. 4).  The subject matter of Rider's Motion to Suppress were all statements made by Rider during this conversation with the officers.

In the Report and Recommendation by Magistrate Judge Johnson that this Court adopted, there were three principal reasons that the Motion to Suppress was denied (Dkt. #124).  First, the Court found that Rider was not under custodial interrogation when he gave his statements to the officers.  Second, the Court found that even if he was under custodial interrogation, Rider waived his *Miranda* rights by voluntarily participating in the conversation with the officers.  The third and final reason was that after looking at the totality of the circumstances, the Court found that there were no due process violations like Rider alleged.  The Court stands with these three reasons.  In Rider's Motion for New Trial, he argues that his case is similar to two cases—*United States v. Romero-Medrano*, 207 F. Supp. 3d 708 (S.D. Tex. 2016) and *United States v. Adair*, No. 4:16-CR-527, 2018 WL 322228 (S.D. Tex. Jan. 8, 2018)—that the Court "proceeded to simply ignore" (Dkt. #173 at pp. 2–3).  The Court does not agree that the cases were disregarded, as they both were mentioned in the adopted Report and Recommendation.  However, the Court will now address both cases and why they do not apply to Rider's situation.

The *Romero-Medrano* case focuses solely on violating a defendant's *Miranda* rights.  The trial judge in the Southern District of Texas concluded that under the appropriate two-factor analysis, the defendant was under custodial interrogation and that he did not voluntarily waive his

*Miranda* rights based on the totality of the circumstances.  In his Motion to Suppress, Rider points toward certain similarities in the factual scenarios of the two cases, including the fact that the defendants were both removed from their homes, separated from their family members, questioned in a patrol vehicle by officers for an extended period, and were unrestrained by the officers during the questioning (Dkt. #101 at pp. 7–9).  While the Court does agree those specific facts are similar to Rider's situation, Rider fails to mention a number of other facts that the *Romero-Medrano* court found important.

In *Romero-Medrano*, the defendant was "taken" outside of his apartment by officers and escorted to the end of his apartment complex parking lot.  207 F. Supp. 3d at 710.  He was then questioned inside a police vehicle.  It was noted that the agents "seated" the defendant in the vehicle.  *Id.* at 713.  After the interrogation, the defendant was instructed by the officer to stand in one place.  *Id.* at 714.  If he wanted to go inside the apartment, an agent would have escorted him inside to get them.  Those facts are distinguishable to Rider's case.  The Court views the location of Rider's questioning in favor of finding that he was not in custody.  Rider was sitting in the passenger seat of the officer's car, which was parked on the street in front of Rider's home, not on the other side of an apartment complex (Dkt. #124 at p. 11).  Multiple courts in this circuit have routinely concluded that this location of questioning does not support a finding of custodial interrogation.  *See United States v. Wright*, 777 F.3d 769, 777 (5th Cir. 2015); *Michalik*, 5 F.4th at 588; *United States v. Jin*, No. 4:21-CR-48, 2021 WL 6137594, at *4 (E.D. Tex. Dec. 2, 2021).  The Court also points out that Rider was not handcuffed at all during this interaction and Rider voluntarily joined the officers in the vehicle, as opposed to being instructed or forced to enter the vehicle (Dkt. #124 at pp. 13–14).  *See United States v. Cavazos*, 668 F.3d 190, 194–95 (5th Cir. 2012) (discussing the importance of the suspect being handcuffed at any point during the

interaction for the analysis).  Before he entered the vehicle, Rider was standing in the front yard with no restraints while officers searched his home and there was no evidence that Rider required close monitoring or a police escort to follow him around (Dkt. #124 at pp. 13–14).  These facts ultimately point out the differences between Rider's case and the *Romero-Medrano* case, as well as supports the conclusion that a reasonable person would have felt free to terminate the questioning and leave the officer's vehicle.  The Court rejects Rider's argument that "absen[t] controverting authority" the Court must change its initial conclusion (Dkt. #173 at p. 3).  The Court responds that the *Romero-Medrano* case is not binding precedent on the Court, and the Court disagrees that the two situations are "identical" (Dkt. #173).  The Court concludes that Rider was not subject to a custodial interrogation and the *Romero-Medrano* case does not change its conclusion.

Even if the Court found Rider was subject to a custodial interrogation, the outcome would not have changed.  That is because Rider voluntarily waived his *Miranda* rights in speaking with the officers.  In *Romero-Medrano*, the facts that the Southern District of Texas found relevant for the second part of the analysis, voluntary waiver, were not present in Rider's situation.  The Court points out that those facts that Rider uses in his argument to show his situation is similar to the *Romano-Medrano* case, only are relevant for the custodial interrogation portion of the analysis.  Some contributing factors for the conclusion that Romero-Medrano did not voluntarily waive his *Miranda* rights were that Romero-Medrano did not understand his rights, he did not have an opportunity to ask questions, and the lack of time he had to waive his *Miranda* rights.  None of those facts are present in Rider's case.  Rider asked numerous questions to the officers in what was described as a conversational tone, including what criminal penalties he was facing and asking whether there was video footage of him (Dkt. #103, Exhibit 1 at pp. 6, 87; Dkt. #124 at p. 6).

Additionally, after Rider had asked if he could consult an attorney and continued to talk to the officers, one officer explicitly interrupted Rider during the conversation and asked Rider "You want to keep talking to us though?" to which Rider responded, "I'll talk to you now, yes" (Dkt. #103, Exhibit 1 at p. 95; Dkt. #103 at p. 14).

The only fact that slightly weighs in favor of Rider that is also present in *Romero-Medrano* is the fact that Rider did not sign a voluntary waiver.  However, "[t]he mere refusal to sign a written waiver does not automatically render inadmissible all further statements made by the defendant." *United States v. Oliver*, 630 F.3d 397, 409 (5th Cir. 2011) (quoting *United States v. Chapa-Garza*, 62 F.3d 118, 121 (5th Cir. 1995)).  Based on the circumstances of Rider's conversation with the officers, it cannot be said that he did not understand his rights, he did not have an opportunity to ask questions, or that he had a lack of time to waive his *Miranda* rights.  The officers explicitly asked if he would like to continue talking with them mid-conversation and Rider, on his own volition, continued speaking to the officers.  The *Romero-Medrano* case is distinguishable from Rider's case.  Rider's conversation with the officers was a *Miranda* waiver because it was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and made knowingly "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" based on the totality of the circumstances. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010); *United States v. Alvarado-Palacio*, 951 F.3d 337, 341 (5th Cir. 2020).  The Court now turns to discussing the *Adair* case.

The *Adair* case does not allege any *Miranda* violations and only discusses when a confession is inadmissible under the due process clause.  2018 WL 322228, at *2.  Regardless of whether the defendant is in custody, a confession is inadmissible under the due process clause if it

is "involuntary, i.e., the product of coercion, either physical or psychological." *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 169 (1986)). The adopted Report and Recommendation illustrates the *Adair* case and succinctly distinguishes *Adair* from Rider's case (Dkt. #124 at pp. 27–29). The relevant facts from the *Adair* case are not present here. The conduct of the officers caused the trial judge in the Southern District of Texas to invoke the due process clause, as the defendant was told "if he did not talk, [the officer] would assume the worst," "[talking] was [d]efendant's one chance to help himself," and that "serious punishment was the all-but-certain result." *Adair*, 2018 WL 322228, at *2. The officers speaking with Rider did not make any statements that could be classified at the same level as the statements made in *Adair*.

In his Motion for New Trial, the only officer conduct Rider points out is that the officers used the word "monster" and brought up the idea that Rider's access to his own children could be impacted (Dkt. #103, Exhibit 1 at pp. 59–60). The Court takes no issue with the use of the word monster in the context of the conversation and finds that it was not used as a coercive tactic. The word was first brought up by the officers after establishing that child pornography was at issue, and the officer told Rider that "we try to determine the person sitting in that seat, what level monster they are. Are they a monster here that's touchin' kids, that's doin' all that, or is it down here and they're just lookin' . . . ." (Dkt. #103, Exhibit 1 at p. 59). As to the comment regarding Rider's accessibility to his children, context is important. The officers informed Rider that they needed to feel comfortable allowing him to have access to his children because of his potential participation in a child pornography scheme. The specific scheme also involved a young girl who was living with Rider at the time. The statement was also only brought up in the context of Rider possibly taking a polygraph. The Court finds that in this limited context, the statement made by the officers was not coercive. Therefore, there is no sufficient conduct, like the conduct in *Adair,*

to invoke the due process clause and suppress the entire conversation.  The Court finds that Rider's statements were not involuntary.

Both the *Romero-Medrano* and *Adair* cases are distinguishable from Rider's case and therefore, the Court finds that Rider's first point will not be sufficient to grant Rider a new trial. The Court would also point out that it disagrees with Rider's assertion that the ultimate decision adversely affected Rider's substantial rights.  Although the Motion to Suppress was denied, the Court granted certain redactions for the audio recording and the transcript of the officer's conversation with Rider that limited what information was presented at trial (Dkt. #170, Exhibit 21) (identified as Government's Exhibit No. 14B).  Any alleged harm that resulted from the denial of the Motion to Suppress was ultimately mitigated at trial.

## II.    Dr. Kristi Compton

Rider's second argument is that because Dr. Kristi Compton ("Compton") was excluded and prohibited from testifying at trial, Rider was deprived of his right to mount a defense against the charges against him (Dkt. #153; Dkt. #173 at p. 4).  Compton is a Texas Licensed Psychologist and conducted a psychological evaluation on Rider (Dkt. #123 at pp. 1–2).  Rider intended for Compton to take the stand and make two conclusions: (1) Rider "shows no signs of pedophilia," and (2) Rider's "personality leads him to be compliant and conflict avoidant, possibly to the point of being in denial about other[s'] intentions" (Dkt. #123 at p. 2).  Ultimately, the Court excluded Compton's conclusions under Federal Rule of Evidence 401, 403, and 702 (Dkt. #146; Dkt. #153). The Court agrees with its prior ruling and the numerous cases cited therein, as Compton's testimony does not have any relevance to the offense charged, and even if it did, the probative value would be substantially outweighed by the risk of jury confusion.  Additionally, the testimony would not be helpful to the trier of fact to understand the evidence or to determine a fact at issue (Dkt. #153).  The Court comes to these conclusions because both motive and proving that the

defendant is a pedophile are not required elements for the crimes charged against Rider.

Rider challenges the Court's prior ruling on two principal grounds.  First, Rider argues that his personality traits were relevant to support "a defense of his willingness to trust his co-defendant," Pettigrew (Dkt. #173 at p. 4).  The Court reiterates that the Tenth Circuit's decision in *United States v. Esch* is helpful for this analysis.  832 F.2d 531 (10th Cir. 1987).  The facts of that case are similar to Rider's situation for the purposes of this argument.  In *Esch*, the defendants were charged with violating the same statute as Rider, 18 U.S.C. § 2251, and one defendant attempted to have a psychologist take the stand.  *Id.* at 534–35.  One of the topics that the psychologist was going to testify about was that the defendant had a dependent personality, as one of the defenses was that "she was duped" by a co-conspirator.  *Id.* at 535.  The district court excluded the testimony, finding that "unless there was an issue of competency or insanity, it would not permit expert testimony on a factual issue within the competence of the jury" because the issue of intent was a matter of fact for the jury.  *Id.*  Reviewing the district court's decision with an abuse of discretion standard, the Tenth Circuit upheld the trial court's decision, finding that the witness testifying "that because of the defendant's personality, she would not have acted in a particular manner" was the expert substituting her judgment as to the defendant's state of mind.  *Id.*  Additionally, the Tenth Circuit found that the testimony regarding the defendant's personality characteristics was excludable because "it addressed a subject matter within the knowledge and experience of the jury and therefore did not meet the helpfulness criterion" of Federal Rule of Evidence 702.  *Id.*  In *Esch*, the defendant took the stand and testified that she did not believe she was producing explicit pictures and that a co-conspirator had tricked her.  *Id.*  Based on that testimony, the jury was fully capable of "making an intelligent evaluation of that testimony without the assistance of an expert" and therefore, it was not an abuse of discretion to prohibit the

psychologist from testifying.  *Id.*

Here, Rider attempted to use the same argument as the defendant in *Esch* why Compton's testimony was admissible.  Rider wanted Compton's testimony to show that because of his personality traits, he "trust[ed] his co-defendant" and believed him when he said that he did not intend to record the minor victims and subsequently did not record the minor children (Dkt. #173 at p. 4).  However, Compton's testimony was not needed to convince the jury of this argument. The record is clear that there were no issues regarding competency or insanity, meaning the only issues for the jury to decide were factual issues, such as Rider's intent, well within their ability to decide.  Additionally, Rider himself took the stand and testified that he trusts people and that he trusts them from the moment he meets them.  The jury was able to determine whether they believed Rider's assertion and whether that impacted the charges against him.  Despite this testimony, the jury still found Rider guilty at the end of the trial.  The Court agrees with the *Esch* decision and finds that because Rider's situation is comparable, his first argument holds no weight. Additionally, as to Rider's potential compliant personality, Rider raised no new arguments or case law in his Motion for New Trial that persuades this Court to find to the contrary.  The Court will now look to Rider's second reason why he was harmed by Compton's exclusion.

Rider's second point is that his lack of a clinical diagnosis as a pedophile is directly related to an element of the charged offenses (Dkt. #173 at pp. 4–5).  Rider was charged with violating 18 U.S.C. § 2251, subsections (a) and (e).  The statute has the following three elements: (1) that the Defendant employed, used, persuaded, induced, enticed, or coerced a minor to engage in sexually explicit conduct; (2) that the Defendant acted for the purpose of producing a visual depiction of such conduct; and (3) that the visual depiction was produced using materials that had been mailed, shipped, and transport in and affecting interstate and foreign commerce by any means, including

16

by computer.  18 U.S.C. § 2251; *see also United States v. Terrell*, 700 F.3d 755, 758–59 (5th Cir. 2012).

Rider's argument addresses the first element, as the Fifth Circuit has recognized the term "sexually explicit conduct" in the statute has been defined as "lascivious exhibition of the genitals or pubic area of any person."  *United States v. McCall*, 833 F.3d 560, 563 (5th Cir. 2016); 18 U.S.C. § 2256.  Rider's specific argument is that a diagnosis of pedophilia directly contributes to the "lascivious exhibition" portion of the definition, because the Fifth Circuit has defined that term to mean "a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excited lustfulness or sexual stimulation in the viewer." *Id.* (citing *United States v. Steen*, 634 F.3d 822, 828 (5th Cir. 2011)).  What Rider essentially argues is that to prove "excitement of lust or sexual stimulation in the viewer," the viewer must be the same individual who was engaging in the acts to acquire the visual depiction of the sexually explicit conduct.  Rider argues that based on that reading of the statute, whether he falls under the definition of a pedophile would be relevant.  The Government argues Rider reads the definition of "lascivious exhibition" too narrowly.  Specifically, "in the viewer" does not "exclusively mean the individual who filmed the depictions" (Dkt. #177 at p. 4).  Rather, that phrase could also refer to depictions filmed to excite other viewers, as an individual can be convicted for certain depictions that are intended for another audience.

The Court agrees with the Government's reading of the statute.  In conducting a statutory interpretation analysis, the Court must first look at the words used in the statute.  *Howard Hughes Co. v. C.I.R.*, 805 F.3d 175, 181 (5th Cir. 2015); *United States v. Molina-Gazca*, 571 F.3d 470, 472 (5th Cir. 2009) (applying the rule to a criminal statute).  In doing so, the Court may not enter its own reading of a statute when there is no statutory language to support such a conclusion.  *See*

*United States v. Santos*, 553 U.S. 507, 518 (2008) ("The insuperable difficulty with this solution is that it has no basis whatever in the words of the statute.").

The relevant statute titled "Sexual Exploitation of Children" describes the type of material that is criminalized involving minors as "any sexually explicit conduct for the purpose of producing *any* visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct . . . ." 18 U.S.C. § 2251(a) (emphasis added).  In describing the type of person who can be prosecuted under this statute, the language simply states that it is "any person" who participates in the scheme to engage a minor in sexually explicit conduct, with the requisite intent.  *Id.*  The Court does not read this language to include a requirement on the Government that the visual depiction must be subjectively enticing to the defendant.  Rider's argument stems from the defined term "lascivious exhibition," which is a term of art mentioned in 18 U.S.C. § 2256 with a judicially created definition.  However, the Court must read the analysis of "lascivious exhibition" to focus specifically on the image itself and the intention that one has in producing that image, as that is consistent with the language of the statute.  Rider's definition would essentially change the Sexual Exploitation of Children charge entirely, requiring the Government to prove that the specific individual who was acting to engage a minor in sexually explicit conduct must have also exhibited excitement of lust or sexual stimulation himself or herself from the material. The Court does not believe that Congress intended for such a requirement to be present, nor does it believe that the Fifth Circuit intended to add that requirement with its definition of "lascivious exhibition."  Judge Higginbotham of the Fifth Circuit has spoken directly on this issue, stating the following:

> Congress did not make production of child pornography turn on whether the maker or viewer of an image was sexually aroused, . . . .  A pedophile may be aroused by photos of children at a bus stop wearing winter coats, but these are not pornographic.  Conversely, a photographer may be guilty of child pornography

> even though he is not aroused by the photos he produces purely for financial gain. Regardless of whether the photographer was aroused by the images he produced, to qualify under § 2251, the images must show a minor being used to engage in sexually explicit conduct.

*Steen*, 634 F.3d at 829 (Higginbotham, J., concurring) (citations omitted).  The Eight Circuit has also come to a similar conclusion.  *See United States v. Wallenfang*, 568 F.3d 649, 660 (8th Cir. 2009) (excluding an expert witness because "the relevant factual inquiry in this case in not whether the pictures in issue appealed, or were intended to appeal, to [defendant's] sexual interests but whether, on their face, they appear to be of a sexual character").  The Court agrees with the Eight Circuit and Judge Higginbotham's reading of 18 U.S.C. § 2251 and will not accept Rider's reading of "lascivious exhibition."

Whether Rider was a pedophile does not change the fact that the Government provided adequate evidence to prove the first element of the charge.  In sum, Compton's testimony was correctly excluded and Rider's second argument for why he is entitled to a new trial must fail for that reason.

## III.    "Emergency" Continuance Denial

The Court will consolidate Rider's next two arguments, as they both relate to the same pretrial ruling—the denial of a continuance to push back the start of trial (Dkt. #138; Dkt. #142). Rider's arguments reiterate the points that were made in his initial motions, stating that (1) Rider was not given ample opportunity to review the relevant child pornography videos that were in the Government's possession, therefore, "this lack of access served to further deprive Mr. Rider of due process" (Dkt. #173 at p. 6); and (2) Rider was not able to effectively use of certain evidence that was disclosed late in the proceedings (Dkt. #173 at p. 8).  Additionally, Rider does not cite to any new cases not mentioned in the order denying the continuance or provide any persuasive arguments to show any actual harm suffered.

19

Beginning with the opportunity to review the evidence, the Court points toward the Adam Walsh Child Protection Safety Act, specifically 18 U.S.C. § 3509(m), which governs the discoverability of child pornography in criminal proceedings like this one. The statute states that so long as the Government provides "ample opportunity" for inspection, viewing, and examination at a government facility of the property or material by the defendant, counsel, or defense expert, the Government will have complied with its obligation. *United States v. Jarman*, 687 F.3d 269, 271 (5th Cir. 2012) (discussing 18 U.S.C. § 3509(m)(B) and the "ample opportunity" requirement). After requiring more briefing on whether the Government complied with the statute, the Court found the Government did provide ample opportunity to Rider's counsel, and it comes to the same conclusion today (Dkt. #142).

On August 30, 2021, Rider's counsel could access the relevant videos at DHS's investigations headquarters. On May 26, 2022, and July 6, 2022, Rider and Rider's counsel could view the video evidence in a private room at the Fannin County Jail. The Government also extended an open invitation to allow both Rider's counsel and Rider's expert witnesses to conduct a private review of the relevant videos. While Rider's computer expert was able to privately review the material at the DHS's investigations headquarters upon request, Rider's counsel never followed-up with the Government. The Court finds that these actions from the Government satisfy the "ample opportunity" requirement that the Government must meet.

Rider also makes the argument that it requested the Government to "identify the number of videos in its possession and identify and provide an index" for the videos (Dkt. #173 at p. 5). While these are not required under the statute, the Government replied to the request that the Government "provide some manner of index – even if rudimentary," as the Government provided a listing of the files that were identified as depicting child pornography, which was the "closest

thing to an 'index' in the government's possession" (Dkt. #127 at p. 2; Dkt. #141 at p. 4).  Rider also attempts to argue that he was prejudiced because he was unable to compare the written transcripts that were disclosed to him with the enhanced audios of certain videos that were played at trial.  This issue was not raised at trial, and Rider does not point to any contradiction or any mistake that comes from the transcripts that resulted in any harm to Rider.  Ultimately, the Court did not err in denying a continuance on the ample opportunity ground, as the Court finds the Government complied with its statutory requirements.

Moving on to Rider's argument that he was unable to effectively use certain evidence, the Court again finds no harm to Rider that the continuance was denied.  The evidence at issue was a police report that contained statements regarding Rider's neighbor, an interview with Pettigrew that mentioned Rider's neighbor, and an interview with Rider's neighbor himself (Dkt. #138 at pp. 1–2).  Rider argues that, in this new evidence, it was brought to Rider's attention that Pettigrew had sent child pornography to Rider's neighbor (Dkt. #138 at p. 1).  Rider argues that the evidence relates to Count Two of the First Superseding Indictment, specifically as to Rider's "alternate suspect" theory.

To start, Rider's "effective use" language stems from the Fifth Circuit rule that even when certain *Brady* material is untimely disclosed, a "defendant is not prejudiced if the evidence is received in time for its effective use at trial."  *Powell v. Quarterman*, 536 F,3d 325, 335 (5th Cir. 2008) (citing *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003)).  This argument first assumes the relevant evidence is classified as *Brady* evidence, then that the circumstances show Rider was unable to effectively use the evidence at trial based on when it was disclosed.

The Court first responds by standing by its position that the relevant report and interviews are not within the purview of *Brady*, as the evidence does not back up the idea that there was an

alternate suspect related to Rider's claims (Dkt. #138).  "[T]here is not a *Brady* violation every time the government does not disclose an alternative suspect," and the standard used by the Fifth Circuit is that a violation occurs "particularly when the other evidence linking the defendant to the crime [is] limited." *Canales v. Stephens*, 765 F.3d 551, 575–76 (5th Cir. 2014); *see also Graves v. Dretke*, 442 F.3d 334, 343–44 (5th Cir. 2006) (finding a valid *Brady* violation because the defense could have "persuasively argued" that the other suspect committed the crime and the evidence at trial rested "almost entirely on [the other suspect's] testimony").  Here, the evidence as to Rider's involvement was not limited, given Rider's participation in the scheme and opportunity that Rider had to place a camera in his neighbor's home, as well as the evidence at trial that included testimony from both the neighbor and the neighbor's daughter who were depicted in the videos. The evidence does not identify any culpable conduct on behalf of the alternate suspect, the neighbor, and therefore, the Court does not agree that *Brady* was implicated here.

However, even if *Brady* was implicated, Rider had the opportunity to cross-examine witnesses related to the alternate suspect, including the neighbor himself.  *See Rousell v. Caldwell*, No. 17-846, 2017 WL 2790701, at *19 (E.D. La. June 7, 2017) (finding that certain evidence that came to light during trial was put to effective use because the topic was fully explored on cross-examination).  During the trial, the record is clear that Rider was able to elicit the relevant testimony that Rider's neighbor received sexually explicit photos of minors from Pettigrew. Additionally, the relevant portions of Pettigrew's interview and the neighbor's interview with law enforcement were also explored on cross-examination.  Therefore, even though both the police report and interviews were disclosed a few weeks before trial began, the Court finds that it had ample time to "effectively use" the evidence at trial, therefore, the Court was well within its authority to deny Rider's request for a continuance.  Additionally, Rider's arguments regarding

what he could have done with the additional time are not convincing, as most of what is requested, including interviewing Rider's neighbor and his daughter, were actions that Rider could have done from the moment that he learned of the charged conduct, almost a year prior to trial.

Finally, the Court will not find that harm existed for the denial of a continuance of the trial date because the Court granted numerous continuances to the parties before finally going to trial. Rider's Final Pretrial Conference ("PTC") was first set for October 2, 2020 (Dkt. #13).  After that, the parties requested six continuances and Rider's PTC was reset all six times before the Court ever set a date for trial (Dkt. #44; Dkt. #49; Dkt. #53; Dkt. #66; Dkt. #77; Dkt. #93).  Upon the seventh request, the Court granted the continuance for the PTC and set both Rider's PTC and the first date of trial for April 4, 2022 (Dkt. #99).  Finally, an eighth continuance was requested and granted, setting the PTC and trial date for July 18, 2022 (Dkt. #105).  Ultimately, the Court finds that Rider had plenty of time to prepare his defense and the denial of its two continuances on the eve of trial did not deprive Rider of due process and is not a valid basis to receive a new trial.

## IV.    Failure to Enforce Subpoena

Rider's fifth reason that he is entitled to a new trial is that the Court failed to enforce Rider's subpoena for Special Agent Bruce Donnett, an employee of the DHS.  The Court's initial ruling on this matter still stands—there are clear, mandatory procedures in this circuit for these types of subpoenas to which Rider did not properly comply.  Rider does not raise any valid argument as to why this conclusion should be disregarded.

Federal agencies are permitted to promulgate regulations, known as *Touhy* regulations, governing the disclosure of information, including through oral or written testimony, pursuant to a movant's request.  *CF Indus., Inc. v. Dep't of Justice Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 692 F. App'x 177, 181 (5th Cir. 2017) (citing *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467–68 (1951)).  The DHS's regulations, set forth at 6 C.F.R. § 5.41 *et seq.*, provide

procedures and standards that govern the production or disclosure of any material or information in its files or within the knowledge of its employees, acquired by reason of their official duties, when responding to subpoenas issued in litigation.  *See United States v. Jiminez-Montoya*, 348 F. App'x 73, 74 n.1 (5th Cir. 2009) (citing 6 C.F.R. §§ 5.41–5.49).  Agent Donnett is an employee of the DHS, meaning that these procedures apply to him if a party wishes for him to testify, as he will not be "provid[ing] oral or written testimony . . . unless authorized to do so by the Office of the General Counsel."  6 C.F.R. § 5.44(a).  The procedures are clear that the party seeking testimony must "set forth in writing, and with as much specificity as possible, the nature and relevance of the information sought."  6 C.F.R. § 5.45(a).

Rider filed a *Touhy* request on July 15, 2022, the Friday before trial was set to begin. Rider's request did not comply with the *Touhy* regulations because his request was untimely and lacked specificity.  Since Rider failed to follow the proper procedures, Rider never received an official denial from the agency, meaning that Rider never received a "final agency decision."  *See McLeod v. Bentley*, No. 8:13-CV-3036, 2014 WL 759632, at *9 (M.D. Fla. Feb. 26, 2014) (finding no final agency decision to review where "[p]etitioner has yet to submit an actual *Touhy* request" summarizing "information sought and its relevance to the proceeding"); *Lopez v. Chertoff*, No. CV-07-1566, 2009 WL 1575209, at *2 (E.D. Cal. June 2, 2009) (stating that "the Court will not compel [the agency] to respond to the subpoena request because the request did not follow [the agency's] *Touhy* regulations"); *Lerner v. Dist. of Columbia*, No. 00-1590, 2005 WL 2375175 at *2 (D.D.C. Jan. 7, 2005) (denying motion to compel and granting motion to quash where requesting party refused to "'set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought'").  Therefore, the Court could not act and grant Rider his stated request.

The first reason that Rider failed to comply with the regulations is that his request was untimely.  There are no specific time requirements in the DHS's *Touhy* regulations, but the agency must have proper time to make an initial determination, weighing the relevant factors under 6 C.F.R. § 5.48.  Here, the request was made so late in the proceedings that there would be no way for the agency to make a valid determination under the relevant regulations without having to request a continuance for trial or a stay of the litigation pending review.  Therefore, the Court finds that Rider's request was untimely.  *See United States v. Bahamonde*, 445 F.3d 1225, 1228 (9th Cir. 2006) (discussing the district court's decision that counsel's request was untimely when he attempted to comply with the regulations after trial had already started).

Rider attempts to argue that he only filed his request so close to trial because he (1) expected the Government to call Agent Donnett as a witness and (2) because of the police report that was later disclosed to Rider.  The Court finds both arguments unconvincing.  First, if Rider relies on the Government to call a witness that he wishes to call, that is a poor trial strategy on the behalf of counsel.  This does not change the relevant analysis here, as it provides no valid justification for why Rider could not have filed his request earlier.  Second, the record indicates that Rider's counsel believed Agent Donnett was the Government's case agent, meaning that he believed he was an important witness for the case, yet he argues in his Motion for New Trial that his reasoning for filing the request so late is because of the alleged *Brady* violations that the Court discussed above (Dkt. #173 at p. 9).  As the Court already found, no *Brady* violations have occurred, and that excuse does not change the fact that Rider had the opportunity to call Agent Donnett as a witness earlier and chose not to.  Agent Donnett's connection to the case was much more involved than just a single police report, as Agent Donnett was one of the officers questioning Rider and was on scene the day Rider was arrested.  The reality is that if Rider desired to call

Agent Donnett as a witness, he should have file the request with adequate time for the agency to respond.

The second reason that Rider's request failed is that at the time he requested the Court to intervene and mandate Agent Donnett to testify, Rider has not satisfied the specificity requirement. As the regulation requires, the request must include "with as much specificity as possible, the nature and relevance of the information sought."  6 C.F.R. § 5.45(a).  According to the record, Rider failed to do that, which is why legal counsel for the DHS responded to Rider's email asking for a clarification for his request after trial had already begun.  There is no evidence on the record that Rider ever received an official denial from the DHS.  However, even if Rider received an official denial, the Court cannot overlook the fact that Rider did not follow the necessary procedures.

Ultimately, the Fifth Circuit has held that compliance with the *Touhy* requirements is "mandatory." *United States v. Wallace*, 32 F.3d 921, 929 (5th Cir. 1994).  Accordingly, the subpoena will be considered quashed because the regulations were not complied with, and no further action is needed from the Court.  *See Landry v. FBI*, No. 97-197, 1997 WL 375881, at *3, (E.D. La. July 3, 1997) (stating that "[w]hether plaintiff seeks testimony or documents from the [federal agency,] he must comply with the appropriate *Touhy* regulations").  Rider's fifth reason for a new trial will be denied.  The Court now turns to Rider's arguments regarding certain conduct that occurred during the trial.

## V.    Character Evidence

The basis of Rider's sixth argument why he is entitled to a new trial is testimony that was elicited that Rider argues reflected poorly on his character during the trial.  There are specific incidents that were elicited through four different witnesses that Rider argues were impermissible under Federal Rule of Evidence 404(b).  Rider argues the Government used extrinsic acts to show

Rider's character or character trait for propensity purposes, meaning the evidence was offered to show the jury that because Rider acted a certain way in the past, he was more likely to have acted in conformity with those acts to commit the charged crimes.  *See* FED. R. EVID. 404(b).  Rule 404(b) does not permit evidence that would allow the jury to make such an inference.  If the Government intended to use the evidence for that reason, there is a notice requirement under Rule 404(b), and here, the Government provided no such notice.  The Government's contention is that the alleged incidents did not fall under the purview of Rule 404(b) and that Rider opened the door to certain acts while at trial.  The Court will address each of the four witnesses and their relevant testimonies but will divide it up based on which party introduced the evidence.  The Court will first address testimony that was elicited during the Government's case-in-chief, then it will discuss testimony that was discussed during Rider's case-in-chief.

### A.  Government's Case-In-Chief

In the pending motion, Rider raises concerns with testimony from three different witnesses that was elicited during the Government's case-in-chief.  The first witness that Rider brings up is the first victim that testified in the trial.  During the witness's direct examination where she was testifying about her interactions with Rider, the Government asked whether Rider had ever provided her chiropractic adjustments[1] in his home or his office.[2]  The minor witness responded in the affirmative to both locations.  However, Rider incorrectly argues that the witness stated that "during the adjustment[s], Mr. Rider touched [her] in a way that was highly inappropriate"

---

[1] To provide context, the Court points out that Rider also worked as a chiropractor in the area.

[2] The Court recognizes the parties confuse the issue as to when this line of testimony was elicited at trial.  Rider argues that it was the young girl that lived with Rider that testified she went to Rider's office and home for adjustments (Dkt. #173 at p. 10).  The Government agreed with this assertion (Dkt. #177 at p. 9).  The record indicates that both parties are mistaken.  The young girl that lived with Rider did not make such an assertion during her testimony.  Instead, the relevant testimony was elicited by the first victim that testified and therefore, the Court will construe Rider's argument as arguing that both the first victim and the young girl that was living with Rider were eliciting improper character evidence under Federal Rule of Evidence 404(b).

(Dkt. #173 at p. 10).   The record indicates that the witness made no such statement during her examination.  Rather, the testimony regarding the alleged inappropriate touching of a minor victim was not presented to the jury until the cross-examination of Rider.  The Court will further address this when addressing Rider's testimony because that portion of testimony was elicited during the Defense's case-in-chief and was dealing with a completely different witness.

Discussing whether the testimony about Rider's chiropractic adjustments were improper, the mere fact that evidence is prejudicial to one's character does not classify the evidence as impermissible character evidence under Rule 404(b).  The conduct alleged is only prejudicial when put in context with Rider's other acts.  The Court points out that Rider did not object to the testimony at the time it was presented at trial.  However, even if the Court were to rule on the merits of Rider's objection, the testimony elicited would not be properly classified as a "prior bad act" under Rule 404(b).  *United States v. Cook*, 557 F.2d 1149, 1152 (5th Cir. 1977) ("But the 'acts' referred to in Rule 404(b) are not any and all acts.").  Generally, the acts need to relate in nature to the present charge.  *See id.*  The Court finds that these interactions that Rider had with the victim do not relate in nature to proving that a person would likely engage in the sexual exploitation of children.  Again, under 18 U.S.C. § 2251 there is no requirement that the perpetrator experienced any excitement of lust or sexual stimulation.  The fact that Rider would conduct chiropractic adjustments on minors that he knew is not something that can be used for propensity purposes when trying to prove Rider participated in a scheme under Pettigrew to film minor children.  Although the Government did not provide any notice under Rule 404(b), it was unnecessary for the first victim's testimony regarding her personal experiences with Rider, as the Court will not delineate from the case law that exists regarding "prior bad acts."

Rider then raises concern with testimony that was elicited during the direct examination of

his neighbor's daughter.  While on the stand, she testified about her interactions with Rider. Specifically, the victim testified that one day while she was outside cleaning her car, Rider approached her and told her she needed to go put clothes on.  The victim was wearing a sports bra and spandex at the time.  Additionally, the victim testified that she and Rider hugged on a few occasions, despite not wanting to and first telling Rider no when he asked.  The witness testified that Rider would play off the situation as a joke.

The Court again notes that Rider did not object to either line of testimony at trial.  The Court also finds that the incidents described are not prior acts as described in Rule 404(b).  While the incidents are obviously prejudicial to the defendant given the pending charges against him, the evidence is relevant to establish Rider's familiarity with the victim and the specific interactions that Rider had with his victims.  These incidents do not show Rider's character or that he has a character trait which would make it more likely that he placed a video camera in his neighbor's bathroom.  Rider argues these acts are "suggesting a lewd or sexual motive to Mr. Rider's conduct" (Dkt. #173 at p. 10).  However, motive is not a required element that the Government must prove in this case.  Rider's argument would force the Court to make a logical leap that it is not prepared to make.  In similar cases, a court has found "prior bad acts" when the Government intended to offer defendant's sexually explicit videos of other children who were not the victim, a prior underage sexual relationship that involved the defendant, and a prior sexual assault by the defendant.  *See United States v. Oriaskwe*, 624 F. App'x 149, 152, 155 (5th Cir. 2015); *United States v. Miller*, No. 10-102, 2011 WL 13137356, at *1–2 (5th Cir. June 30, 2011).  Here, the testimony that was elicited by the victim was not evidence of an assault or any sexual conduct on behalf of Rider.  *See Cook*, 557 F.2d at 1153 (stating that the Government would need to attempt to introduce evidence of prior fraudulent or other improper acts because the defendants were

charged with mail fraud).  Additionally, those prior bad acts in the above-referenced cases were all involving other individuals.  The victim in this case was merely testifying about her personal experiences with Rider.  This conduct again is not protected by the notice requirement of Rule 404(b).

The next witness that Rider mentions in his pending motion is the testimony of the young girl that was living with the Rider family.  The victim's testimony was similar to the witnesses already discussed.  The young girl took the stand and testified that Rider bought her a phone and generally testified about her interactions with Rider.

Again, Rider did not object to this testimony at trial, and the testimony elicited are not "prior bad acts" covered under Rule 404(b) because of the charges against Rider.  *Cook*, 557 F.2d at 1152.  Here, the Government did not elicit any character or character trait and the Court views this witness's testimony as merely establishing necessary background to understand how Rider would have the opportunity to provide Pettigrew with sexually explicit videos of this young girl. Overall, as to the victim's testimony that was elicited during the Government's case-in-chief, the Court finds that the none of the testimony by the three above-mentioned witnesses discussed any "prior bad acts" as described in Federal Rule 404(b).  The Court will now address the issues raised with Rider's testimony.

### B.  Defendant's Case-in-Chief

After the Government presented its case-in-chief, Rider himself took the stand.  Rider raises a concern about an incident that arose during his testimony.  At the end of the cross-examination, the Government began questioning Rider about his relationship with the young girl that lived in the Rider home and accused Rider of abusing that victim on a prior occasion. Specifically, the Government mentioned an incident where the victim was suffering from a sports-related injury and Rider offered to provide her an adjustment.  During that interaction, the

Government accused Rider of inappropriately touching the victim.  The record indicates that Rider denied the entire interaction.  Rider's counsel timely objected to the line of questioning and moved for a mistrial.  While this testimony surely constitutes a "prior bad act" under Rule 404(b), the Government argues Rider opened the door for that line of questioning when he stated on direct examination that he had never done anything inappropriate to a child.  The record indicates that both parties agreed that Rider made that assertion.  The dispute arises on whether this claim opened the door for the line of questions that the Government elicited.

A criminal defendant makes his character an issue, losing the protection of Rule 404(b), when he testifies.  *United States v. Mikolajczyk*, 137 F.3d 237, 244 (5th Cir. 1998) (citing *United States v. Tomblin*, 46 F.3d 1369, 1388 (5th Cir. 1995)).  This rule does not provide the Government free rein, as the Government is limited on cross-examination to "instances of misconduct that are clearly probative of truthfulness or untruthfulness."  *Id.* (citing *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981)).  Ultimately, this forces the Court to conduct an analysis on "the purpose for which the prosecutor introduced the other-acts evidence," to determine whether Rule 404(b) or 608(b) applies.  *Tomblin*, 46 F.3d at 1388.  Rule 608(b) applies when other-acts evidence is offered to impeach a witness, to show the character of the witness for untruthfulness, or to show bias.  *Id.* When the Government offers other-acts evidence to impeach the defendant while they are on the stand, courts have interpreted this limited purpose as showing the character of the witness for untruthfulness.  *United States v. Akpan*, 407 F.3d 360, 373–74 (5th Cir. 2005); *MGMTL, LLC v. Strategic Tech.*, No. 20-2138, 2022 WL 594894, at *9 (E.D. La. Feb. 28, 2022) (stating that "classic example of a permissible inquiry [under Rule 608(b)] would be an incident in which the witness had lied.").  In *Akpan*, the defendant testified on direct examination that he did not enter into a scheme to defraud Medicare, he did not authorize the home care clinics to bill Medicare for

services that he did not render, and that he did not receive payments for those services.  *Id.* at 374.

On cross-examination, the Government was permitted to challenge that assertion and present

evidence of numerous healthcare providers that charged Medicare and paid the defendant directly.

The Fifth Circuit found that because the evidence "directly contradicted" the defendant's

testimony on direct examination, the evidence was properly admitted under Rule 608(b).  *Id.* at

374.  In *United States v. Yong Ping Liu*, the defendant took the stand and testified that she never

filed a document with the immigration agency that she knew to be false.  288 F. App'x 193, 204

(5th Cir. 2008).   The Government was permitted, under Rule 608(b), to question the defendant on

cross-examination regarding her prior false visa application.  *Id.*  Finally, for an alleged bad act to

be admissible under Rule 608(b), there must be a basis in fact.  *United States v. Skelton,* 514 F.3d

433, 444 (5th Cir. 2008); *McCaleb v. Rely Transp., Inc.*, No. 4:19-CV-640, 2021 WL 4048552, at

*2 (N.D. Tex. Jan. 5, 2021).  The basis in fact requirement does not mean that it must be proved

as a fact before a good faith inquiry can be made.  *Skelton*, 514 F.3d at 433.

      Here, Rider took the stand, placing his character at issue in the trial.  During Rider's direct

examination, the record indicates that Rider was asked twice whether he had ever done anything

inappropriate to any of the children, and both times, he answered he had not.  The first time this

was brought up was in the context of the church events.  The second time was regarding his

daughter's friends that would stay the night.  Additionally, during the second line of questioning,

the record indicates that Rider was asked whether there were ever any issues with the children

staying at his home, to which he responded no.   After Rider objected to the Government's

questions, the Court asked the Government whether it had a good faith basis for bringing up an

event that occurred with the young girl who was staying with the Rider family.  On the record, the

Government stated that it did.  Therefore, the Court finds that in challenging Rider's assertions

that he made on direct examination, the questions that were asked by the Government during the cross-examination of Rider were within the Court's discretion in determining the admissibility of impeachment evidence under Rule 608(b). *See United States v. Farias-Farias*, 925 F.2d 805, 809 (5th Cir. 1991) ("The trial judge's discretion under Rule 608(b) is very substantial."). However, the testimony must also survive the balancing test under Federal Rule of Evidence 403. *Id.*

Although neither party discussed this rule in their briefing, the Court finds that the testimony as it stands will survive the balancing test. In order for testimony to be excluded under Rule 403, the probative value of the evidence must be substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FED. R. EVID. 403. The strongest basis for Rider is that the probative value of the evidence that was elicited would be substantially outweighed by the danger of unfair prejudice, namely that the jury would hear what had happened with the young girl that was staying in the Rider home and convict Rider for that crime, rather than the crimes charged. When the Court views the record and what exactly what was elicited, the Court ultimately finds that the testimony that was elicited should not be excluded under Rule 403. The questions that were asked on cross-examination were essentially an account from the young girl who lived in the Rider home about an interaction that occurred between her and Rider. Rider had the opportunity to deny everything that occurred and he did. No documents were offered to prove the prior act. *See Young Ping Liu*, 288 F. App'x at 205 (discussing that although the Court permitted questions about the documents, "[a]dmissions of the actual documents . . . is a closer call"). Additionally, the Government was only allowed to ask those questions during Rider's cross-examination. There was no mention of the incident during the Government's closing argument and again, there was no overstepping on behalf of the Government, as the evidence was used to merely impeach the

witness.  The Court finds that this danger of unfair prejudice to Rider only comes in as a result of him opening the door to such testimony during his direct examination.  Therefore, the Court ultimately finds that the danger of unfair prejudice does not substantially outweigh the probative value of deciding whether Rider's testimony was truthful.  For all of those reasons, the Court finds that the testimony was proper under a Rule 403 analysis.

In sum, the Court finds that Rider opened the door himself, meaning that the Government was allowed to inquire about the specific incident with the young girl that was living with the Rider family for impeachment purposes.  Therefore, the Government was not required to provide the requisite notice under Rule 404(b).  Overall, Rider's sixth argument why he is entitled to a new trial will be denied.

## VI. Hearsay – Pettigrew's Statements

Rider's seventh argument why is he entitled to a new trial is based on hearsay statements that Rider argues were improperly excluded.  During Rider's direct examination, he attempted to elicit specific statements made by Pettigrew regarding his lack of intent to record the minor victims.  Rider argues that these statements were not offered for the truth of the matter asserted, but were offered to prove the effect on the listener, how Rider took Pettigrew at his word (Dkt. #173 at p. 11).  The record makes clear that the Court excluded the specific statements made by Pettigrew but allowed Rider to still testify how he responded and what he believed after having a conversation with Pettigrew.  Rider argues that Pettigrew's statements to Rider were essential to present his defense that he did not know the minor victims were being recorded (Dkt. #173 at p. 11).  The Court disagrees.  Rider also does not cite to any cases or rules that would convince the Court to come to a different conclusion.

In *United States v. Liu*, the defendant wanted to offer a statement that he was fearful for his life and the cause of his fear.  960 F.2d 449, 452 (5th Cir. 1992).  The Court allowed the

testimony that he was fearful.  However, the cause of the defendant's fear came from specific statements that were excluded because they were hearsay.  The Fifth Circuit ruled that "[e]vidence was admitted as to Liu's state of mind but not hearsay evidence as to the exact nature of the cause of that condition.  There was no error in the evidentiary ruling." *Id.*  The same situation is present here.  Although *Liu* was decided under the state of mind exception under Federal Rule of Evidence 803(3), the same applies for the state of mind exclusion under the definition of hearsay.  *See United States v. Rubin*, 591 F.2d 278, 283 (5th Cir. 1979) (explaining how certain evidence to show state of mind is an argument that the testimony does not fall under the definition of hearsay under Federal Rule of Evidence 801 because it is not used for the truth of the matter asserted).  The Court properly excluded Pettigrew's statements because they were hearsay with no proper exclusions or exceptions.

However, even if the Court wrongly excluded Pettigrew's statements, the harm to Rider was minimal, meaning it disagrees with Rider's assertion that because of the Court's ruling, "Rider was further deprived of his right to present his defense to the jury" (Dkt. #173 at p. 11).  If Rider's true intention of eliciting Pettigrew's statements to Rider was to establish Rider's state of mind, the Court's ruling did not prohibit him from doing that.  The record indicates that the jury heard Rider's theory that he believed Pettigrew had no intention of filming the minor victims and that he thought they were only putting audio devices in the children's room.  The jury weighed that evidence and ultimately decided that Rider was still guilty.  The Court does not see how allowing Pettigrew's statements would have helped the jury come to a different conclusion, given the fact that they were informed of Rider's state of mind with the evidence admitted.  Accordingly, Rider's seventh argument in his Motion for New Trial will be denied.

## VII.    Hearsay – "Camera Gate"

During the Government's case-in-chief, Rider's neighbor testified that he had a discussion

with Rider about an incident that Rider coined "camera gate."  According to the record, this term meant the moment where the Rider family found out there were cameras being placed in Rider's own home.  Rider raises an issue about this conversation because Rider's neighbor, who testified about the incident, only learned about this incident from his wife, who had heard about it from her daughter, who had heard about the cameras from Rider's daughter.  Rider did not object to this testimony at trial, yet now he argues that he was deprived of a fair trial because of its admission, given the "multiple layers of hearsay" (Dkt. #173 at p. 12).  The Government responds, stating that because Rider was the declarant, the initial statement is an opposing party statement.  Additionally, the follow-up questions were only asked to provide context to that portion of the conversation (Dkt. #177 at p. 12).

The Court agrees with the Government.  The record indicates that the term "camera gate" only came up during the neighbor's testimony because he elicited a statement by Rider where Rider brought it up in a conversation describing the Rider family's past summer.  Specifically, while Rider and his neighbor were talking and catching up, Rider stated that once the family got past "camera gate," everything was good.  This first mention of the term was admissible because it was an opposing party statement under Federal Rule of Evidence 801(d)(2).  The issue arises on the questions that followed, as the Government asked Rider's neighbor if he was familiar with that term and if the neighbor understood what that phrase meant in the context of the conversation. The neighbor never elicited a statement from anyone.  Instead, he answered that he had heard that term and provided the context for what he believed Rider meant when he stated "camera gate" in their conversation.  The Government offered this testimony to provide context to Rider's initial, admissible statement, meaning that the Government was not using it for the truth of the matter asserted.  *See United States v. Garcia*, 268 F. App'x 317 318 (5th Cir. 2008) ("Palacio's statements

36

were properly admitted to provide context for the statements of other co-conspirators, as opposed to for the truth of matter asserted in the statements."); *United States v. Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006) ("[S]tatements providing context for other admissible statements are not hearsay because they are not offered for their truth.").  Because the neighbor's answers were simply informing the jury what a certain phrase meant, the Court did not err in allowing testimony related to "camera gate."  Additionally, any potential harm that Rider suffered was cured on cross-examination, as Rider's neighbor was questioned about his conversation with Rider and how much weight he held to the mention of "camera gate" because he had heard about it from other people.  Another way that Rider cured any potential harm was when Rider himself took the stand and testified that the conversation never actually took place.  When looking at the totality of the circumstances at trial, the Court does not find support for a finding that allowing these clarifying questions "affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Peaches Ent. Corp.*, 62 F.3d at 694.  Rider's eighth argument as to why he is entitled to a new trial will be denied.  The Court will now turn to Rider's sufficiency of the evidence arguments.

**VIII.   Sufficiency of the Evidence**

The Court will consolidate Rider's last two arguments, as they essentially argue that same thing—no rational jury member could find Rider guilty given the evidence for each count.  Rider's ninth argument specifically argues that there is not sufficient evidence for Count Two and that it is merely "speculative," because there was evidence of an alternative suspect (Dkt. #173 at pp. 12–13).  Rider's tenth argument is that all three counts must fail under a sufficiency analysis because there is no evidence as to Rider's "specific intent" to create the sexually explicit videos (Dkt. #173 at p. 13–14).  The Court will consolidate these arguments by addressing each of the three counts and whether there was sufficient evidence to permit a conviction.

### A.  Count One

Count One of the First Superseding Indictment is for Conspiracy to commit the Sexual Exploitation of Children a/k/a Production of Child Pornography (Dkt. #96 at p. 1).  The specific conduct is alleged to have taken place at the Denison Church of Nazarene (Dkt. #138 at p. 1).  The jury was presented with the question of whether the Government proved three elements beyond a reasonable doubt: (1) That the Defendant and another individual did conspire to employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct; (2) That the Defendant acted for the purpose of producing a visual depiction of such conduct; and (3) That the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer (Dkt. #160 at p. 12).

The evidence is clear that Rider was in a leadership position at the church, where he oversaw a group of teenagers.  In this role, Rider worked with the church's pastor, Pettigrew, and over time, the two developed a friendship.  Together, the two would host certain events with the teenagers, such as car wash fundraisers or "sibling fight night," that provided Rider and Pettigrew the opportunity to commit their crimes.  At the church, there was a hard drive found that both Pettigrew and Rider had access to with dozens of videos of minors at the church.  In these videos, the minors were undressing and bathing after the above-mentioned events in the church's children's room.  These videos indicate that the cameras were angled directed at the children's genitals.  Also in these videos, Rider was setting up the various cameras with no children present before the event began, the children would walk into the children's room after being directed by Rider or Pettigrew, and finally, Rider was seen taking the cameras down after the children would leave.  At some point the Government arrested Pettigrew for his participation in these schemes.  After this happened, Rider conveniently bought new phones for himself and his family before the

authorities ever had a chance to search Rider's home or phone.  Eventually, authorities arrived at Rider's home and conducted a search.  While that occurred, the jury heard Rider's conversation with two officers where Rider admits to setting up certain devices in the children's room at the request of Pettigrew.  Rider also admitted during that interaction that he believed Pettigrew was a pervert, had a sex addiction, and that he did not respect personal boundaries, but Rider continued to work with Pettigrew and took part in these events with numerous children involved.  The record also indicates that the images of minor children that were on the hard drive were used on the applications Yahoo! and Kik.

Rider argues that there was no "specific intent" on his behalf because he was acting with no knowledge of what was happening with the videos.  Rider raised a few arguments to support this idea, such as Pettigrew telling Rider that the devices were for another purpose, Rider not believing that Pettigrew would film these minor children because Rider's own children were present at these church events, and the fact that Pettigrew had power over Rider because Pettigrew had gained access to all of Rider's accounts and had explicit pictures of Rider's wife.  However, the jury had the opportunity to believe Rider when he stated these reasons, or they had the opportunity to view the facts as they appear—that Rider was willingly working with Pettigrew to obtain the sexually explicit videos of the minors.  The Court reiterates that there is no requirement under the statute that the Government had to prove that Rider was a pedophile or that he was in sexually intrigued by the images that were being taken.  The only intent element necessary under 18 U.S.C. § 2251 is that Rider acted with the purpose of producing a visual depiction of the sexually explicit conduct.  The Government offered ample evidence supporting this fact, with Rider acknowledging that he was setting up devices in a room where the children would be changing at the direction of both Pettigrew and Rider.  The jury had the ability to decide whether

Rider had the requisite mental state to be convicted for Count One and ultimately found that he did.

In sum, the facts support the idea that a rational juror could believe that Rider was conspiring with Pettigrew to get these sexually explicit videos of minors and therefore, there is sufficient evidence to support a conviction for Count One of the First Superseding Indictment.

### B.  Count Two

Count Two of the First Superseding Indictment is for Attempt to commit the Sexual Exploitation of Children a/k/a Production of Child Pornography (Dkt. #96 at p. 2).  The specific conduct is alleged to have taken place at the home of one of Rider's neighbors, as cameras were placed in the neighbor's bathroom (Dkt. #138 at p. 1).  The jury was presented with the question of whether the Government proved three elements beyond a reasonable doubt: (1) That the Defendant did or did attempt to employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct; (2) That the Defendant acted for the purpose of producing a visual depiction of such conduct; and (3) That the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer (Dkt. #160 at p. 15).

The evidence presented to the jury makes clear that there were two possible answers for who placed the cameras in the neighbor's bathroom: Rider or the neighbor himself.  The record is clear that Rider and the neighbor were friends and would visit each other's home from time to time to watch various sports events.  The evidence that was introduced by the Government stated that at some point, Rider asked the neighbor if he could give his phone number to Pettigrew because Pettigrew did not have a lot of friends.  The neighbor began communicating with Pettigrew and eventually, Pettigrew sent the neighbor sexually explicit pictures of children.   The neighbor

testified that sometime after Pettigrew sent him those pictures, Pettigrew asked the neighbor for some pictures of the young girl living with the Rider family.  The neighbor declined.  The neighbor informed Rider about his conversations with Pettigrew, and Rider informed the neighbor that he would take care of it.  The evidence offered indicates that Pettigrew admitted to officers that he had sexual conversations with others regarding the neighbor's daughter and Rider's stepdaughter.  Ultimately, Pettigrew received photos of the neighbor's daughter in her bathroom.  Although these photos did not depict any nudity, actual nudity is not relevant for an attempt of the relevant crime.  *See United States v. Johnson*, 639 F.3d 433, 438–42 (8th Cir. 2011).  The images of the neighbor's daughter were on the same hard drive that was found in Pettigrew's office.  As to accessibility, Rider had access to both the neighbor's home and bathroom.  In fact, Rider had used the exact bathroom where the pictures were taken.  Pettigrew had never been in the neighbor's home, meaning that he would have no access to place the cameras in the neighbor's bathroom himself.

The evidence that was introduced by Rider tells a different story.  Rider focused on the fact that the officers in this case failed to investigate the neighbor as a viable suspect, as well as countering some of the neighbor's testimony by offering contrary statements.  Specifically, Rider testified that Pettigrew and the neighbor became friends without Rider's involvement.  Testimony was also elicited that Pettigrew admitted to "sexually discussing" two victims with the neighbor, his own daughter and the young girl who was living with the Rider family.  After hearing both sides, the jury ultimately agreed with the Government.  For sufficiency of the evidence challenges, all reasonable inferences from the evidence must be construed in favor of the jury verdict.  *United States v. Runyan*, 290 F.3d 223, 238 (5th Cir. 2002).

Rider now argues that because he is not filmed setting up the cameras like he was for the incidents that took place at the church or his own home, that there is no sufficient evidence to

support a conviction (Dkt. #173 at pp. 12–13).  Although the Court does agree that there is no direct evidence on the matter that Rider placed the videos in the neighbor's home, the Court recognizes that there is circumstantial evidence that supports the idea that Rider was the one who set up the cameras.  Because Rider was the one who set up cameras not only at the church but in his own home, it is not out of the question that he set up the cameras in his neighbor's bathroom.  The Government showed that Rider had been in his neighbor's home many times and that he had been in that specific bathroom before.  The record indicates that Pettigrew was sexually attracted to the neighbor's daughter, and it was not out of the question for Pettigrew to ask someone to acquire pictures of young children for him.  Based on that idea, the jury could likely infer that Rider merely accepted another one of Pettigrew's requests to put the camera in his neighbor's bathroom, just like he had already done for Pettigrew by taking videos at the church and at his own home.  The jury was informed that the law makes no distinction between the weight that they are to give to either direct or circumstantial evidence (Dkt. #160 at pp. 4–5).  The Court disagrees with Rider's assertion that "no rational jury could have convicted him on Count Two" (Dkt. #177 at p. 13).

Rider raises another argument that he alleged that there was another perpetrator who must have committed the actions alleged in Count Two.  Specifically, that there was "substantial" evidence of the neighbor being guilty of filming his own daughter, absolving Rider as the culprit (Dkt. #173 at p. 13).  Rider alleges this is the case because the neighbor admitted to receiving child pornography from Pettigrew and the neighbor obviously would have access to his own bathroom (Dkt. #173 at p. 13).  However, the neighbor took the stand and testified that he believed Pettigrew sent him those pictures to entice him to engage in sexual relations, as he believed Pettigrew was a homosexual.  The record indicates that Rider had the same belief.  And as to the accessibility point,

both Rider and the neighbor had access to the bathroom in question.  However, the relevant inquiry is whether a rational juror could have found that Rider committed this crime.  The mere possibility that there is an alternative suspect does not automatically negate the jury's findings, as the Court agrees with the Government that the relevant question is not "which person is most likely the perpetrator" (Dkt. #177 at p. 13).  The jury could have taken the fact that Rider had participated in this scheme with Pettigrew for other children, including one staying in his own home, as more convincing evidence than the idea that a man decided to film his own daughter.  The jury weighed the facts in front of them, including the multiple alleged suspects, and ultimately found that Rider was guilty.

In sum, the facts support the idea that a rational juror could believe that Rider attempted to obtain these sexually explicit videos of the neighbor's daughter and therefore, there is sufficient evidence to support a conviction for Count Two of the First Superseding Indictment.

### C.  Count Three

Count Three of the First Superseding Indictment is for Sexual Exploitation of Children a/k/a Production of Child Pornography (Dkt. #96 at p. 3).  The specific conduct is alleged to have taken place in Rider's own home, as the videos depict a young girl who was living with Rider at the time (Dkt. #138 at p. 1).  The jury was presented with the question of whether the Government proved three elements beyond a reasonable doubt: (1) That the Defendant did or did attempt to employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct; (2) That the Defendant acted for the purpose of producing a visual depiction of such conduct; and (3) That the visual depiction was produced using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer (Dkt. #160 at pp. 17–18).

The evidence is clear that the Rider family had taken in a young girl due that had an unstable home life.  Sexually explicit videos of the young girl were on the same hard drive that was found in Pettigrew's office at the church.  The videos were taken inside the Rider's home, inside a bathroom that was primarily used by the children.  The Court will note again that it was clear Pettigrew was sexually attracted to this young girl and had even asked individuals who were not Rider to obtain sexually explicit photos of her.  In the videos that were taken, Rider is seen turning the videos on and off to capture the time that she was in the bathroom.  In the videos that were shown at trial, this occurred various times while the young girl was going to take a shower, meaning she would undress and step in the shower, which was all on the videos.  The young girl testified that she recalled certain times where Rider would stop her before going to the bathroom because Rider would need to "fix something" quickly before she would enter.  Additionally, the young girl testified that at one point, she saw a hook with a flickering light and thought it was strange.  She brought it up to Rider's daughters, and Rider was eventually brought into the conversation.  Rider informed the young girl that those hooks had always been there.  Soon after the conversation took place, the hooks were taken out.

Rider argues again that there is no evidence to show the requisite intent to support a conviction.  The Court again disagrees.  Under 18 U.S.C. § 2251, the Government must show beyond a reasonable doubt that Rider acted with the purpose of producing a visual depiction of the sexually explicit conduct.  The evidence supports this element being satisfied.  The jury had the ability to decide whether Rider had the requisite mental state or to believe the idea that he did not know how those cameras were present and had nothing to do with it, which is what he argued when he took the stand.  The jury decided that Rider was guilty on Count Three.

In sum, the facts support the idea that a rational juror could believe that Rider obtained

these sexually explicit videos of minors for Pettigrew and therefore, there is sufficient evidence to support a conviction for Count Three of the First Superseding Indictment.   All of Rider's sufficiency of the evidence arguments must fail because they all try to relitigate Rider's defense theory at trial.  Just because you raise a defense at trial does not mean there is insufficient evidence to support a conviction.  Rider's ninth and tenth arguments suffer from the same defect as the rest of Rider's arguments—there is no valid basis in law or in fact that Rider raises to support the granting of Rider a new trial.  The Court will uphold the decision that was made by the jury.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion for New Trial (Dkt. #173) should be **DENIED.**

It is further **ORDERED** that Government's Motion to Strike Defendant's "Supplement to His Motion for New Trial" (Dkt. #180) should be **GRANTED.**   Accordingly, Defendant's Supplement to His Motion for New Trial (Dkt. #179) will be **DISMISSED.**

**IT IS SO ORDERED.**

**SIGNED this 17th day of February, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE